423 A.2d 1251

Roger O'MALLEY

v.

PEERLESS PETROLEUM, INC., Michael Pregnar, Brinton J. Richards and The Sewer Authority of the City of Scranton

v.

Dolen MORROW and Rose Morrow, his wife, Leonard Bergamino and Frank Santarsiero, individually and d/b/a Santarsiero & Sons Plumbing & Heating Co.

Appeal of The SEWER AUTHORITY OF the CITY OF SCRANTON.

Roger O'MALLEY

v.

PEERLESS PETROLEUM INC., Michael Pregnar, Brinton J. Richards and The Sewer Authority of the City of Scranton

v.

Dolen and Rose MORROW, Leonard Bergamino, Frank Santarsiero, individually and t/a Santarsiero Sons Plumbing and Heating Co.

Appeal of PEERLESS PETROLEUM INC.

Superior Court of Pennsylvania.

Argued Sept. 11, 1979.

Filed Dec. 29, 1980.

Petition for Allowance of Appeal Denied April 10, 1981.

276

Michael J. Donahue, Scranton, for appellant at Nos. 2654 and 2658.

Robert W. Munley, Scranton, for O'Malley, appellee.

Joseph P. Lenahan, Scranton, for Peerless Petroleum at No. 2654 and for Pregnar, at No. 2658.

Cody H. Brooks, Scranton, for Richards, at No. 2654 and Sewer Co., at No. 2658.

Before CERCONE, President Judge, and WATKINS, and HOFFMAN, JJ.

CERCONE, President Judge:

The instant appeals come to us from the Court of Common Pleas of Lackawanna County. The original defendants, Peerless Petroleum, Inc., (hereinafter, Peerless) and the Scranton Sewer Authority (hereinafter, Sewer Authority), joined several additional defendants, among them Frank Santarsiero, Sr. d/b/a Santarsiero and Sons Plumbing & Heating Company (hereinafter, Santarsiero & Sons). The Sewer Authority also filed a cross-claim against Peerless, seeking indemnity in the event that it should be held liable as against the plaintiff-appellee, O'Malley. Trial began November 9, 1977 before President Judge Conaboy and lasted eleven working days. The jury was charged as to the defendants' negligence, the plaintiff's lost wages, his loss of future earnings, his past medical expenses, and the cost of future cosmetic surgery. Judge Conaboy did not charge the jury as to the plaintiff's possible contributory negligence, nor did he submit to them the Sewer Authority's cross-claim against Peerless. He also directed a verdict in favor of Santarsiero & Sons. After four and one-half hours of deliberation, the jury returned a verdict for O'Malley in the amount of $400,000 against Peerless and the Sewer Authority, jointly and severally. The Sewer Authority moved alternatively for judgment n. o. v. or for a new trial. Peerless also moved for a new trial. All post-trial motions were denied by the court en banc, from which denial Peerless and the Sewer Authority bring their appeals.

On June 5, 1973, while in the process of connecting a sewer line from the house of Dolen and Rose Morrow to a lateral sewer line owned by the Sewer Authority, Roger O'Malley, an apprentice plumber with his stepfather's plumbing concern, Santarsiero & Sons, was transformed for a brief excruciating moment into a human torch by the explosion of gasoline fumes which had collected in the main

sewer line and the trench in which he was working. As a result of the explosion, the plaintiff suffered severe burns of the arms, upper torso and head, including the reduction in the size of his ears by one-third.

Two months before this unfortunate incident, Leonard Bergamino had struck a gasoline pump at a Citgo service station, owned by Peerless and operated by Michael Pregnar, damaging both the pump and pipes connecting it with the subterranean storage tanks. Brinton J. Richards was called upon to repair the damage but his work was apparently inadequate and the pipes continued to leak gasoline into the ground beneath the station. Between the date of repair and June 5, 1973 approximately 12,000 gallons of gasoline leaked from the pump and pipes without detection by Peerless or Pregnar. A substantial quantity of this gasoline found its way into the sewer system by way of a crack in the sewer line at a manhole (No. 39) in the immediate vicinity of the station. During the same two-month period the Sewer Authority received reports of gasoline fumes coming from the sewer lines in that area of Scranton. It dispatched teams to investigate the reports on several occasions but each time they checked the line in question they stopped short of manhole No. 39. The Sewer Authority concluded that the gasoline was the result of periodic dumping and not of a leak into the system. On the day of the explosion there was an odor in the area where O'Malley was working, but neither he nor any of the other Santarsieros thought it anything unusual, although as plumbers they had been trained to be wary of peculiar odors because of the explosive nature of sewer gas.

I

APPEAL OF PEERLESS PETROLEUM, INC.

Peerless first assigns as error the directed verdict in favor of Santarsiero & Sons. Peerless contended that Santarsiero

& Sons knew or should have known of the danger of working in an area where gasoline fumes were present.[1] We stated the law pertaining to directed verdicts succinctly in *Stephens v. Carrara*, 265 Pa.Super. 102, 401 A.2d 821 (1979).

"In our Commonwealth, it has long been held that only in a case where the facts are all clear, and there is no room for doubt, should the case be removed from the jury's consideration, and a motion for directed verdict or binding instructions be granted. *Cox v. Equitable Gas Co.*, 227 Pa.Super. 153, 324 A.2d 516 (1974). Thus, before granting a directed verdict, the court must accept as true all facts and proper inferences from the testimony which tend to support the contentions of the party against whom the motion has been made, and further, must reject all testimony and inferences to the contrary. *Liuzzo v. McKay*, 396 Pa. 183, 152 A.2d 265 (1959); *Continental Supermar-*

---

1. Paragraph 6 of Peerless' complaint joining Santarsiero & Sons as additional defendants reads:

6. Original Defendant avers that the proximate cause of the accident was the carelessness and negligence of the additional defendant, Frank Santarsiero, individually and d/b/a Santarsiero & Sons Plumbing and Heating Company in that he, by his agents, servants, workman and employees:

(a) Knew or should have known of the existence of gasoline and gasoline vapors or other dangerous substances in the performance of the aforesaid sewer line installation;

(b) Failed to stop the aforesaid sewer line installation until such time as the presence of gasoline and its vapors or other dangerous substances were removed;

(c) Failed to instruct the plaintiff on the proper use of an instrumentality with the flame in a confined area;

(d) Permitted ignition of an instrumentality with a flame in the area of the plaintiff's work;

(e) Failed to warn the plaintiff of the dangerous condition existing at the time of the sewer line installation;

(f) Failed to properly inspect the premises prior to authorizing plaintiff to perform his work;

(g) Failed to provide plaintiff with a safe place to work;

(h) Was otherwise negligent under the circumstances.

> ket *Food Service, Inc. v. Soboski,* 210 Pa.Super. 304, 232
> A.2d 216 (1967)."

*Id.,* 265 Pa.Super. 105, 401 A.2d at 822.

■ Peerless bases its argument in part on the testimony of Rose Morrow.[2] Mrs. Morrow testified that she saw a man in black work-clothes get out of a Santarsiero & Sons truck and that shortly afterward she saw him holding a torch. She testified that she had not seen the man before, nor was she able to identify any of the Santarsiero workers as the man-in-black. She did not see him after the accident, and she could not testify that she saw him or anyone else carry a torch, or other lighted object, into the trench. Peerless further contends that there was an odor of gasoline in the air at the time of the explosion. Anthony Arbochus testified that he smelled gasoline shortly before the accident, but Arbochus was several houses away from the accident site when he smelled the odor, rather than in the immediate vicinity. O'Malley and the other Santarsieros testified that there was an odor present, but they testified that it smelled like sulfur or coal and not like gasoline. From their experience and training such an odor indicated no danger. Applying the test set out in *Stephens,* we find the evidence which tends to support Peerless' contention together with the inferences properly drawn therefrom insufficient to make out a question for the jury. We conclude that the directed verdict in favor of Santarsiero & Sons was proper.

■ We are next asked to consider whether it was error to allow the jury to consider O'Malley's future earnings' loss. Peerless' argument is that there was not sufficient evidence to place the issue of the loss of future earnings before the jury. We think otherwise. In order to collect for the loss of future earnings, a plaintiff must establish that his economic horizon has been shortened. Peerless cites as authoritative the case of *Bochar v. J. B. Martin Motors,* 374 Pa. 240, 97 A.2d 813 (1953). That case involved the permanent injury of the plaintiff in an automobile accident on the Pennsylvania

2. Also joined by Peerless as an additional defendant.

Turnpike in which the defendant admitted fault, and the question put to the jury was solely one of damages. The plaintiff, who had been a lineman for the telephone company and whose knee had been permanently damaged in the accident, could no longer climb telephone poles. Consequently, the telephone company transferred him to a different division of the company, where he was earning more money. As Justice Musmanno stated there:

"The office worker who loses a leg has obviously had his earning ability impaired even though he can still sit at a desk and punch a comptometer as vigorously as before. It is not the status of the immediate present which determines capacity for remunerative employment. Where permanent injury is involved, the whole span of life must be considered. Has the economic horizon of the disabled person been shortened because of the injuries sustained as the result of the tort feasor's negligence? This is the test. And it is no answer to that test to say that there are just as many dollars in the patient's pay envelope now as prior to his accident. The normal status of a healthy person is to progress, and to the extent that his progress has been curtailed, he has suffered a loss which is properly computable in damages." *Id.,* 374 Pa. at 244–45, 97 A.2d at 818.

In the instant case there was testimony that appellee's injuries were permanent, as well as testimony that he could never return to his former occupation, and that he would lose wages as a result. We think this was sufficient to present the question to the jury.

Peerless also contends that even if it were proper to consider future earnings' loss, it was improper to compute them based on the wages of a journeyman plumber, since O'Malley was only an apprentice at the time of the injury. For the jury to consider properly the earnings' loss as computed for a journeyman plumber, appellee must have established that he would probably have progressed to the higher position. Two federal cases considered similar issues: *Frankel v. United States,* 321 F.Supp. 1331 (E.D.Pa., 1970) and *Hoffman v. Sterling Drug Co.,* 374 F.Supp. 850 (M.D.

Pa., 1974). *Frankel* involved a nineteen-year-old woman who was studying to be a commercial artist. The Court considered evidence of her progress in school, samples of her work and her family history in determining whether damages for future loss of earnings could be computed based on her projected earnings as a commercial artist. In *Hoffman* the court stated that the test to be used to determine whether the plaintiff would have progressed from his current station to the profession for which he was preparing is "not the age, preinjury occupation nor the nature of the proposed profession, but rather the sufficiency of the plaintiff's evidence in showing his skill, likelihood of becoming a member of the profession and availability of work in that area." *Hoffman*, 374 F.Supp. at 861. Applying the *Hoffman* test we cannot say that it was error to allow the jury to determine appellee's future earnings' loss based on his projected income as a journeyman plumber. He had worked as an apprentice plumber for almost three years. There was no evidence here, unlike in *Hoffman*, that the period of apprenticeship was long past; here appellee was not yet eligible to take the journeyman's test. At trial he was qualified as an expert to give an opinion as to certain uses of pipes, pipe fittings and connections, and the effects of the use of force on them, without objection by either appellant. There was also testimony offered that O'Malley had intended to remain in the family plumbing business and that employment would have been available in the field, if he had been able to seek it.

█ Peerless also asks us to consider the propriety of precluding an expert witness from testifying about the wage rate of computer programmers.[3] Dr. Ohberg, a clinical psychologist and a vocational expert, was called by appellee to testify as to the wage rates of plumbers and the availability of work for plumbers, as well as to the appellee's post-accident work abilities and limitations. On cross-exam-

---

3. O'Malley had, apparently, attended a local college following the accident, where he briefly studied computer programming. He did not complete his course of study.

ination, in an apparent attempt to show there were other lucrative vocations in which appellee's injury would not be disabling, Peerless asked and Dr. Ohberg affirmed that with additional training appellee could become a computer programmer. The trial court, however, would not permit Peerless to cross-examine her on the question of the wage rates for computer programmers. Appellant cites *Holton v. Gibson*, 402 Pa. 37, 166 A.2d 4 (1970) for the proposition that a defendant is entitled to make a determination as to the extent that a plaintiff's progress has been shortened by the injury for which he seeks to collect damages. Although the truth of this cannot be denied, it is equally true that the progress to be questioned is the progress in the plaintiff's profession at the time of the accident. See *Bochar, supra*; and see *Wright v. Engle*, 256 Pa.Super. 321, 389 A.2d 1144 (1978). Consequently, we find no error in the court's curtailing inquiry into the field of computer programming.

■ Peerless also assigns as error the refusal of the trial judge to allow it to cross-examine O'Malley concerning a stipend he is alleged to have received from the Veterans Administration while he attended college subsequent to the accident. This issue was not raised in post-trial motions below and, hence, was not preserved for consideration here. *Benson v. Penn Central*, 463 Pa. 37, 342 A.2d 393 (1975).

■ We are next asked to consider whether the trial court erred in refusing to instruct the jury that there was insufficient evidence to establish O'Malley's loss of wages between the date of the accident and trial. Appellant strongly urges that we follow the case of *Gordon v. Trovato*, 234 Pa.Super. 279, 338 A.2d 653 (1975). The *Gordon* case arose as the result of injuries the plaintiff sustained in an automobile accident. There, as here, we were asked to consider whether there was sufficient evidence to put the question of lost wages before the jury. In *Gordon* we set out three factors which must be proved before a determination of lost wages, based not on conjecture but on fact, can be made: the plaintiff's wage rate at the time of injury; the amount of work available to the plaintiff; and the capacity at which

plaintiff's employer was operating. In the instant case, appellee testified that he earned a salary of $125.00 per week and not an hourly wage, thus meeting the first requirement. As for the amount of work available to appellee had he not been injured, there was testimony that showed that he was working for the family plumbing business and that he could have continued to work if he had been able to do so. For the third element, capacity of his employer's operations, there was testimony that logically tends to show that Santarsiero & Sons was working beyond its capacity during the pretrial period. Despite illness, Frank Santarsiero, Sr. continued to work in the business, although at reduced hours. This logically shows that O'Malley's labor was needed, and because he was unavailable, his ailing step-father was obliged to remain at least partially active. As we said in *Gordon, Id.,* 234 Pa.Super. at 286, 338 A.2d at 675, "[t]he law requires not merely conjecture, but rather sufficient data from which damages can be assessed with reasonable certainty." (Citations omitted.) Based on the facts in this case, we find that appellee sufficiently established the necessary elements as to allow a jury determination of the amount of his lost wages.

The next allegation of error deals with the trial court's instruction to the jury that appellee could recover for the cost of future surgery. Peerless argues that allowing the jury to award damages for contemplated future surgery to restore appellee's ears is mere conjecture and is reversible error. *Lorch v. Eglin,* 369 Pa. 314, 85 A.2d 841 (1953). In *Baccare v. Mennella,* 246 Pa.Super. 53, 369 A.2d 806 (1976), where we found that the plaintiff failed to prove the probability of future damages occasioned by injuries suffered in an automobile accident, we stated the law thusly:

"In order for a jury to be permitted to consider the future continuation of a disability as an element of damages, it is necessary that there be competent testimony of the likelihood that the disability will persist into the future. Some evidence must be submitted from which the jury can reasonably infer what the probable future consequences of

the injury will be and award damages accordingly. *Rice v. Hill*, 315 Pa. 166, 172 A. 289 (1934); *Schwegel v. Goldberg*, 209 Pa.Super. 280, 228 A.2d 405, *allocatur refused*, 209 Pa.Super. *xxxix* (1967). This does not mean that expert medical testimony is required to predict with certainty the exact result expected. . . . *Stevenson v. Pennsylvania Sports & Enterprises, Inc.*, 372 Pa. 157, 93 A.2d 236 (1952); *Lorch v. Eglin*, supra." *Id.*, 369 A.2d at 807.

Unlike *Baccare*, appellee's physician was able to state with some certainty the cost of the plastic surgery to restore O'Malley's damaged ears ($10,600). The physician was also able to state that it was very likely that a man of O'Malley's age would elect to undergo such restorative surgery. Given the cost of the surgery and the likelihood that a young man similarly injured would choose the surgery, we feel that the jury had sufficient evidence before it to award the appellee damages to cover the cost of the surgery.

██ Peerless next contends that it was reversible error to allow the appellee's expert witnesses to testify at trial. The basis of the argument presented is surprise. Peerless relies heavily on the cases of *Nissley v. Pennsylvania R. R. Co.*, 435 Pa. 503, 259 A.2d 451 (1969), and *Moore v. Howard P. Foley Co.*, 235 Pa.Super. 310, 340 A.2d 519 (1975) to support its contentions. *Moore* held that it was error to allow a witness to testify when opposing counsel was given the witness' name only two days before he would be called to testify. Although this writer did not fully agree with the majority in *Moore*, what was said there of *Nissley* is still cogent:

"In *Nissley v. Pennsylvania Railroad Company*, 435 Pa. 503, 259 A.2d 451 (1969), cert. denied 397 U.S. 1078, 90 S.Ct. 1528, 25 L.Ed.2d 813 (1970), it was held that the trial judge erred in permitting a surprise witness to testify. *Nissley* does not stand, however, for the principle that all "surprise" witnesses are precluded from testifying. Each case presents unique problems whose solution rests best in the discretion of the trial court. In *Nissley*, the aggrieved party did not learn of the surprise witness' existence until the very day he testified." *Id.*, 235 Pa.Super. at 320, 340 A.2d at 523.

In the instant case Peerless asserts that Dr. Ohberg, Dr. Vlassis, Mr. Karam, and Mr. Pukita should not have testified. The record reveals that the names of all of these witnesses were given to opposing counsel before trial, two weeks before they were to testify, except for Mr. Pukita. In his pretrial witness list counsel for O'Malley listed a "mechanical engineer," although no name was given, because the identity of the witness was not then known. When the identity of the witness became known to appellee's counsel, he made the same known to the appellants. This occurred a week in advance of Mr. Pukita's testimony. We do not think it error to have allowed these witnesses to testify. Opposing counsel was aware what their testimony would be, and there would seem to have been more than adequate time to investigate their credentials.

 Lastly, Peerless presents two related claims: that the verdict was excessive and that a new trial, if granted, should not be limited to damages. Based on the evidence, we cannot say that the jury erred in awarding O'Malley $400,000.00 in damages. As the court en banc below stated in its opinion, O'Malley's injuries are permanent and their severity astonishing. We need not consider the latter contention since no new trial is granted.

## II

### APPEAL OF SCRANTON SEWER AUTHORITY

 The Sewer Authority also raises numerous questions. Several of these were also raised by Peerless and we, therefore omit discussing them further. These issues include the sufficiency of the evidence of past and future earnings' lost, as well as future medical expenses, and the propriety of directing a verdict with respect to Santarsiero & Sons. Among the remaining issues, the Sewer Authority first assigns as error the denial of its motion for judgment n. o. v. The law in Pennsylvania has long been that judgment n. o. v. should only be entered in the clearest of cases, and then only after the court has sought out and considered all the evidence which supports the verdict, resolving any

doubts in favor of the verdict winner. *Stewart v. Chernicky*, 439 Pa. 43, 266 A.2d 259 (1970); *Moyer v. Ford Motor Co.*, 205 Pa.Super. 384, 209 A.2d 43 (1964); *Ksiazek v. Pelle*, 174 Pa.Super. 304, 101 A.2d 428 (1953). There appears ample evidence in the record to support the jury's finding of liability on the part of the Sewer Authority. The fact that the Sewer Authority had knowledge of the presence of gasoline in the sewer lines in the vicinity of the accident was undisputed at trial. So, too, was the fact that it had dispatched crews to investigate the complaints of gasoline odors and that, although they checked several manholes on the same line as manhole 39 and found gasoline, they did not continue to search for the source of the gasoline, which they would certainly have found and remedied if the search had continued. We cannot say that on this basis the jury was unwarranted in its finding against the Sewer Authority.

 The next three allegations of error raised by the Sewer Authority pertain to evidentiary questions. The Sewer Authority alleges that it was error to allow William Karam, a sanitary engineer, to answer a hypothetical question put to him by counsel for appellee O'Malley.[4] More

4. The text of the hypothetical question reads:
"Q. BY MR. MUNLEY: All right. Now, Mr. Karam, you've been given one hypothetical that you answered concerning the leakage of gasoline at Mike Pregnar's Citgo Station. Now in addition to those facts, would you also assume that on April 10th, 1973, the Scranton Sewer Authority took a sample of sewage from the North-South Road and received an opinion from a chemist that the sewage sample contained gasoline, and assume that again on May 14th, 1973, that Henry Hulse, an employee of the Scranton Sewer Authority, reported that gasoline was floating on top of the sewage in a manhole along Oram Street, and that on other occasions, a strong but unidentified odor was present in the wet well of the Keyser Valley Plumbing Station, and that on each of these occasions a crew of the Scranton Sewer Authority checked for the presence of gasoline by lifting manhole covers and smelling, and doing this, they went as far as two manholes north on North Keyser Avenue and two manholes south from the intersection of Keyser Avenue and Oram Street, and assume that after the explosion of June 5th, 1973, the Scranton Sewer Authority was able to locate gasoline as it entered the sewer at Manhole 39 in a period of five hours? Based on those facts, do you have an opinion which is based on reasonable certainty and from the point of view of a sanitary engineer as to whether the course pursued

exactly, the Sewer Authority alleges that this hypothetical omits certain uncontradicted material facts and is, therefore, invalid. A hypothetical question need not contain all the facts of the case, but only those which are material and uncontradicted. *Battistone v. Benedetti*, 385 Pa. 163, 122 A.2d 536 (1956); *Karavas v. Poulos*, 381 Pa. 358, 113 A.2d 300 (1955). Appellant alleges the hypothetical question did not include the uncontradicted facts that regular checks for gasoline odors were made at the Keyser Valley Pumping Station, which serviced the area in question, and that checks of the manholes as far as the immediate vicinity of the intersection of Keyser Avenue and Oram Street were conducted whenever an odor was detected. The hypothetical put to Mr. Karam clearly omits the facts which the Sewer Authority alleges, but we do not think this omission was fatal to the question's validity. The law on hypothetical questions in Pennsylvania also states that "[i]f opposing counsel are of the opinion that material facts are not included in a hypothetical question, they may incorporate those facts in questions asked on cross-examination, and may also frame questions involving a consideration of facts which they contend are established by the evidence: *Albert v. Philadelphia R. T. Co.*, 252 Pa. 527, 532, 533, 97 A. 680 (1916)." *Rudolph v. Shannopin Coal Co.*, 142 Pa.Super. 389, 18 A.2d 329 (1940). See also *Gordon v. State Farm Life Ins. Co.*, 415 Pa. 256, 203 A.2d 320 (1964); *Price v. Yellow Cab Co. of Phila.*, 443 Pa. 56, 278 A.2d 161 (1971). We cannot say that it was error to allow Mr. Karam to answer the question as put to him, particularly where the Sewer Authority could have supplied the missing facts on cross-examination.

The Sewer Authority further asserts that the verdict is excessive insofar as it was based on the testimony of David Bunin, an actuary who testified as to the appellee's future earnings' loss. It is asserted that his computations allow for a greater interest rate than the six percent legal rate. Appellant did not raise the question in its post-trial motions.

by the Scranton Authority to determine the source of the gasoline and to eliminate the presence of gasoline in the Sewer System was reasonable and diligent?"

Consequently, it failed to preserve the issue for appeal, and we cannot, therefore, consider it. *Benson v. Penn Central Trans. Co.*, 463 Pa. 37, 342 A.2d 393 (1975).

■■■■■ The Sewer Authority next assigns as error the admission of evidence, despite its objection, relating to post-accident measures undertaken by it to alleviate the danger caused by the gasoline flowing into the sewer system. The evidence specifically objected to is the fact that after the explosion it took only five hours to find the source of the gasoline, and that thereafter a certain chemical compound was introduced into the sewer system to prevent future explosions which might be caused by the gasoline. It is well settled that evidence of subsequent repair is not admissible to impute antecedent negligence, but such evidence may be admissible for other relevant purposes. *Incollingo v. Ewing*, 444 Pa. 299, 282 A.2d 206 (1971). The Sewer Authority readily admits this in its brief to be true. It claims no impropriety in the admission into evidence of the testimony about the chemical compound, but argues that the jury should have been given limiting instructions on the matter. The record does not reveal any instruction on this point proposed by the Sewer Authority, nor does it reveal any exception to the jury charge in the Sewer Authority's post-trial motions. Because the question was not preserved for our consideration, we express no opinion as to the argument's merit. See *Benson, supra.*

■■■■■ The Sewer Authority additionally asserts that it was error not to charge the jury on the question of appellee's contributory negligence.[5] *Heffernan v. Rosser*, 419 Pa. 550, 215 A.2d 655 (1965), set out the law on this issue. As the court said there, " 'a trial judge should not instruct a jury to find a material fact in the absence of evidence to support the findings (citations omitted) .... [W]here there is any evidence which alone would justify an inference of the

5. The Pennsylvania Comparative Negligence Statute, 17 P.S. §§ 2101, 2102 (Supp.1980) is not applicable since the accident occurred prior to September 7, 1976, and the act is not to be applied retroactively. See *Costa v. Lair*, 241 Pa.Super. 517, 363 A.2d 1313 (1976).

disputed fact, it must go to the jury, no matter how strong or persuasive may be the countervailing proof . . . . [I]f a plaintiff's case discloses no contributory negligence and if the defendant offers no evidence from which plaintiff's contributory negligence may be inferred, therefore, since it is defendant's burden to establish contributory negligence, it is the duty of the trial court to give binding instructions that no such question exists in the case. . . .' " *Id.*, 419 Pa. at 554–55, 215 A.2d at 657. The record reveals no possible inference of contributory negligence from the plaintiff-appellee's case. On the other hand, appellant attempted to show contributory negligence but presented no evidence which would support such a finding. There is no evidence which places the gasoline odor in or near the trench; the only odor detected in the immediate vicinity of the accident was one similar to that found at old coal dumps. Both appellee and the Santarsieros testified that this was not an odor which would indicate danger to a trained plumber. Furthermore, there is no evidence that there was any flame in the trench where appellee was working. There was testimony concerning the mysterious man-in-black, but even if credible it did not place the torch in the trench or near the main sewer, but only beside the work area. This was not enough to present the question of contributory negligence to the jury.

Lastly, the Sewer Authority contends it to have been error not to submit its cross-claim against Peerless to the jury. The Sewer Authority's claim was based on theories of indemnity and "passive" negligence. The law in Pennsylvania on indemnity was thoroughly set out in the case of *Builders Supply Co. v. McCabe*, 366 Pa. 322, 77 A.2d 368 (1951). *Builders Supply* involved an action for indemnity and contribution after the plaintiff had paid a judgment recovered against him for injuries sustained by a party injured in an automobile accident. Our Supreme Court said there:

"The right of *indemnity* rests upon a difference between the primary and the secondary liability of two persons

each of whom is made responsible by the law to an injured party. It is a right which enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable. The difference between primary and secondary liability is not based on a difference in *degrees* of negligence or on any doctrine of *comparative* negligence,—a doctrine which, indeed, is not recognized by the common law. See *Fidelity & Casualty Co. of New York v. Federal Express, Inc.*, 6 Cir., 136 F.2d 35, 40. It depends on a difference in the *character* or *kind* of the wrongs which cause the injury and in the nature of the legal obligation owed by each of the wrongdoers to the injured person. Secondary liability exists, for example, where there is a relation of employer and employee, or principal and agent; if a tort is committed by the employee or the agent recovery may be had against the employer or the principal on the theory of respondeat superior, but the person primarily liable is the employee or agent who committed the tort, and the employer or principal may recover indemnity from him for the damages which he has been obliged to pay. Another example, and perhaps the most familiar one, is when a pedestrian is injured by falling in a hole in the pavement of a street; in such a case the abutting property owner is primarily liable because of his failure to maintain the pavement in proper condition, but the municipality is secondarily liable because of its having neglected to perform its duty of policing the streets and seeing to it that the property owners keep them in repair; if therefore the injured person chooses to bring suit against the municipality the latter can recover indemnity from the property owner for the damages which it has been called upon to pay. * * * But the important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory

law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible. In the case of *concurrent* or *joint* tortfeasors, having no legal relation to one another, each of them owing the same duty to the injured party, and involved in an accident in which the injury occurs, there is complete unanimity among the authorities everywhere that no right of indemnity exists on behalf of either against the other; in such a case, there is only a common liability and not a primary and secondary one, even though one may have been very much more negligent than the other. The universal rule is that when two or more contribute by their wrongdoing to the injury of another, the injured party may recover from all of them in a joint action or he may pursue any one of them and recover from him, in which case the latter is not entitled to indemnity from those who with him caused the injury." *Id.,* 366 Pa. at 325–328, 77 A.2d at 37–371.

The Restatement (Second) of Torts § 886B states the following:

§ 886B. INDEMNITY BETWEEN TORTFEASORS
"(1) If two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, he is entitled to indemnity from the other if the other would be unjustly enriched at his expense by the discharge of the liability.

(2) Instances in which indemnity is granted under this principle include the following:

\* \* \* \* \* \*

(e) The indemnitor created a dangerous condition of land or chattels as a result of which both were liable to the third person, and the indemnitee innocently or negligently failed to discover the defect"

The case at bar presents a situation analogous to the sidewalk example set out in *Builders Supply.* Both the Sewer Authority and Peerless had a legal obligation to protect O'Malley from the harm which arose from the gasoline in the sewer system. It is another matter altogether to say

that the Sewer Authority should be held jointly liable with Peerless for that harm. The Sewer Authority had a right to have its claim for indemnity decided by the jury at the same time it considered O'Malley's claims. The jury ought to have been permitted to determine whether the Sewer Authority's failure to discover the source of the leakage was merely negligent, and thus, whether it was entitled to indemnity by Peerless. This is particularly true where as here, the jury's determination would collaterally estop the Sewer Authority from showing otherwise at the subsequent trial for indemnification.

For this reason, we reverse the order of the lower court denying the Sewer Authority's motion for a new trial and remand the case for a trial to determine the indemnification issue alone. We specifically do not disturb the jury verdict of $400,000.00 in favor of the appellee.

Remanded for new trial consistent with this opinion. So ordered.