J-S57041-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| RYAN LEONARD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|        Appellant | |
|        v. | |
| KELLER WILLIAMS REALTY INTERNATIONAL, INC., KELLER WILLIAMS PHILADELPHIA-NE MARKET CENTER, PHILADELPHIA REGIONAL REALTY, LLC, LEE ABRAMS, KELLER WILLIAMS REAL ESTATE AND BANK OF AMERICA | |
|        Appellees | No. 644 EDA 2014 |

Appeal from the Order Entered January 23, 2014
In the Court of Common Pleas of Bucks County
Civil Division at No: 2014-0357

BEFORE:  DONOHUE, MUNDY, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:          **FILED DECEMBER 04, 2014**

Appellant, Ryan Leonard, appeals *pro se* from the January 23, 2014 order entered in the Court of Common Pleas of Bucks County, denying his Petition for Preliminary Injunction.  Following review, we affirm.

Appellant initiated an action against Appellees alleging fraud, fraudulent misrepresentation, intentional interference with prospective contractual relations, and a violation of Pennsylvania's Unfair Trade Practice and Consumer Protection Law, all relating to a residential property owned by Appellee Bank of America and offered for sale by Appellees Philadelphia Regional and listing agent Lee Abrams ("Abrams") of Keller Williams Real

Estate (collectively "Appellees"). In his complaint, and the amended versions thereof, Appellant sought specific performance for the sale of the property to Appellant as well as monetary damages. Appellant also sought to enjoin the sale of the property by petition for injunctive relief, the denial of which gave rise to this appeal.

As the trial court explained:

> The underlying issue in this case revolves around the sale of a residential property located at 99 Upland Drive, Southampton, PA ("the property") which [Appellant] was interested in purchasing. On January 17, 2014, [Appellant] filed a Complaint against Appellees, asserting Abrams (who was acting on behalf of all co-Appellees) made fraudulent representations to [Appellant] as to the (un)availability of the property to be shown. The nature of the alleged misrepresentations made by Abrams are twofold, and consist of the following: (1) Abrams informed [Appellant] that the property was not available to be shown and later showed the property to other prospective buyers and (2) Abrams informed [Appellant] that the property was "under contract" on December 18, 2013. [Appellant] holds that Abrams knew (or should have known) that both of these communications were false and [Appellant] justifiably relied on them.

Trial Court Opinion ("T.C.O."), 5/22/14, at 2 (footnote and citations to record omitted).

In his petition for injunctive relief, Appellant sought to enjoin Appellees from proceeding with a closing on the property scheduled for January 28, 2014. In the petition, Appellant requested "only that the sale of the property be temporarily enjoined so that [Appellant] be given an opportunity to have his claims decided on the merits." Emergency Petition for

Preliminary or Special Injunction, 1/17/14, at ¶ 14. He did "not seek to require the sale of the property be made to [him]." *Id.*

The trial court conducted a hearing on Appellant's petition on January 23, 2014 and provided the following detailed summary of evidence presented at that hearing:

> The property was listed on December 2, 2013. According to [Appellant], it was listed on TREND ("the website to allow the public as well as other realtors to see the property") as active.
>
> At the hearing, [Appellant] explained that he had been interested in the property based on its size and location and continuously expressed that interest to his real estate agent, Tom Byrne, of Prudential Felte Realty. An affidavit of Mr. Byrne, although it was not entered into evidence at this hearing, was considered by us. Thereafter, on December 4, 2013 Mr. Byrne contacted [listing agent] Abrams and was informed that the property could not be shown at that time. Abrams explained that "there were still repairs being done to the home at that time on behalf of [seller] Bank of America despite that the property was listed as active." Between December 4, 2013 and December 13, 2013 Mr. Byrne contacted or attempted to contact Abrams to schedule a showing on eleven (11) different occasions. On December 13, 2013 Abrams stated he would call the following Monday if the property was available to be shown or to provide an update. After receiving no response from Abrams, Mr. Byrne contacted him on December [18], 2013 and was informed that the property was "under contract." According to the Complaint, "Abrams acknowledged to Mr. Byrne that the property was shown to other potential buyers, which included his own clients."
>
> As a result, [Appellant] first contacted Keller Williams' in-house legal department and was referred to both Dave Conord, the regional director of [] Keller Williams for Pennsylvania, New Jersey, and Delaware, and Bob Roman, the operating principal for Keller Williams Philadelphia Northeast Market Center. E-mails were exchanged between [Appellant] and Mr. Roman on numerous occasions between December 20, 2013 and January 7, 2014. Additionally, [Appellant] received a letter from Keller Williams on January 2, 2014.

[Appellant] avers that the property was not under contract on December 18, 2013 as Abrams informed him.

On January 2, 2014, [Appellant] was informed that Abrams reached out to Mr. Byrne asking if [Appellant] would be interested in submitting a backup offer in case the original sale did not go through. [Appellant] explained he would be interested in doing so but only after he had an opportunity to view the property.

On January 11, 2014 [Appellant] was able to view the property. On January 13, 2014 he submitted an offer of $451,000, which was over the asking price of $404,900.

As of the date of the hearing, the property was scheduled to be sold on January 28, 2014.

Abrams testified that the property initially went to sheriff's sale in October of 2013. [Bank of America] decided to sell the property as-is as opposed to making any unnecessary repairs. The property was listed as "active" on MLS.com (a real estate website), as [Appellant] indicated, because Abrams was not instructed by Bank of America to indicate otherwise and he expected the property "to be cleaned any day." According to Abrams, he "did not receive any instruction from the seller to remove it as active at that time." Bank of America contracts their asset management to a company named "Steward Lender Service." The asset manager for this particular property is Roger Bustillos. On December 2, 2013 Abrams received a listing agreement from the asset manager. Shortly thereafter Abrams walked through the property and informed the asset manager that "nothing had been done" on the property yet. Safeguard Properties was employed as a field service team to physically inspect the property on behalf of Bank of America. The inspection took place and the property was totally cleaned and ready to be viewed on December 15, 2013. Abrams was made aware that there was an issue with mold in the property which was later addressed at the end of December.

At the outset, Abrams testified that he had over twenty (20) agents contacting him on behalf of clients that were interested in the property and, to the best of his ability, he spoke with everyone and informed them to check back with him regarding a showing of the property or, in the alternative, check with

"Showing Time," which is a separate and third party entity that is responsible for setting up the showing appointments. One of these agents was Mr. Byrne (who was [Appellant's] agent). According to Abrams, this is normal protocol in real estate, as agents have to register with Showing Time and "it reduces any sort of liability and ensures whoever's going to look at the property is who they say they are." Abrams instructed Showing Time that there were to be no showings of the property until everything was clean in order to limit Bank of America's potential liability, as there was debris in the residence and holes in the floor and he did not want any potential buyers being injured. On December 16, 2013 Abrams instructed Showing Time to start setting appointments. In fact, the MLS.com website specifically listed the Showing Time phone number and instructed agents to call Showing Time directly to make an appointment for a showing. Abrams stated that he did not contact Mr. Byrne on December 16 or December 17, 2014 to specifically inform him the property was available to be shown. However, on December 16, 2013, six potential buyers viewed the property and any one of these buyers could have submitted a bid.

Abrams went on to testify that he was consistent in instructing all agents who made an inquiry about the property to continually follow up with him as to when the property would be shown. He stated . . .
> . . . if you look at . . . the last e-mail that I have with Mr. Byrne, I was actually going to the property to take a look at it . And I told him to follow-up with me just to prevent myself ever from getting in a situation such as this.
>
> . . . .
>
> . . . I pretty much told [the agents] to follow-up with me. I'd like to sit here and say I can remember every conversation I had with Mr. Byrne, and I can't. There were, like I said, there were a lot of agents interested in this property.

Another agent from Prudential Felte (where [Appellant's] agent was employed) viewed the property on December 16, 2013.

The individuals who at this time were in the process of purchasing the property and had entered into a purchase agreement were owner occupants who "have been very

- 5 -

aggressive." The owner occupants contacted Bank of America initially and were told to contact Abrams. They did so and initially requested that Abrams submit a bid blindly on their behalf. They did not make being shown the property a condition for making a bid, as they had seen the property previously when it was up for Sheriff sale. On December 16, 2014, the first day the property was available for showing, Abrams submitted a bid on behalf of these unnamed buyers. This was the only bid submitted on the property, and it was accepted by Bank of America on December 17, 2013. These buyers submitted their offer with "special financing," or a construction loan. Abrams represented both the buyer and Bank of America, and earned a commission of five percent (5%). His commission would have been two percent (2%) had he represented only the bank and the property was sold to another buyer.

The listing report, Exhibit A to [Appellant's] complaint, states the property was sold on December 23, 2014. Appellee Abrams went on to explain:

> . . . the bank accepts an offer, and this is normal for any bank that I deal with. They will accept the offer through a system that I use called Equator. And once they accept that, the bank will not sign a single document until they have everything executed by the buyer.

> Now, what that entails is the bank first has to accept an offer. When they accept that offer, they generate what's called their corporate addendum. That corporate addendum pretty much protects the bank.

> And as a matter of fact, normally an attorney would tell a buyer not to sign it unless they want the property. It's that one-sided of . . . an addendum because the bank never lived in the property . . .

> . . . that addendum is drawn up and then sent to me upon the acceptance of the offer. That is then sent to the buyer's agent. . . The agent then has to make any changes to the agreement of sale or just draw up a new agreement of sale that matches the same terms of the corporate addendum. . .

And then all those items are then drawn up, put together, sent back to Lender Stewart Services. Lender Stewart Services then sends it to, for final approval, to Bank of America and the investors on the loan. So it's not just a matter of the asset manager always signing. They have to get approval before they do that.

So it's not unusual for a property to be accepted and then ten days later, 15 days later, to go to pending. So I can't put it to pending until we have a fully executed agreement.

Thereafter the bid was accepted on December 17, 2013, and the contract was not finalized until December 23, 2014. Abrams explained that he would have had his clients submit an offer during this six-day period, as banks do not necessarily go with the highest offer. In fact, in terms of [Appellant's] offer, Abrams stated that there would have been some concern with his offer, as it was a conventional mortgage and the repairs needed for the property would not be considered by the bank.

Abrams testified that he did not prevent anyone from trying to put a bid on the property, nor did he give [Appellant's] agent any incorrect information.

T.C.O., 5/22/14, at 3-9 (footnotes and citations to record omitted).

At the conclusion of the hearing, the trial court announced that the preliminary injunction was denied. N.T. Injunction Hearing, 1/23/14, at 84. Appellant filed a timely appeal to this Court.[1] In response to the trial court's order dated March 5, 2014, Appellant filed a timely Concise Statement of

---

[1] Appellant's appeal from the January 23, 2014 order was timely filed on Monday, February 24, 2014, because February 22, 2014 fell on a Saturday. *See* 1 Pa.C.S.A. § 1908 (stating that for computations of time, whenever the last day of such period shall fall on a Saturday or Sunday or a legal holiday, such day shall be omitted from the computation); *see* Pa.R.A.P. 903, *Note* (noting Pa.R.A.P. 107 incorporates by reference the rules of construction of the Statutory Construction Act, 1 Pa.C.S. §§ 1901-1991).

Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b) asserting five claims of trial court error. Appellant reordered those issues in his brief and we have reordered them here for purposes of our discussion as follows:

1. Did the trial court commit an abuse of discretion or error of law by basing its ruling on the misplaced premise that contract principles governed the dispute at issue?

2. Did the trial court commit an abuse of discretion or error of law by holding that the appellant was not and could not be entitled to relief simply because there was never a written contract agreement entered into?

3. Did the trial court commit an abuse of discretion or error of law by permitting Appellees' counsel to ask repeated leading questions of his own client, who is a named party in this case, over the objection of Appellant, after that witness was first called and cross-examined by Appellant as an adverse party?

4. Did the trial court commit an abuse of discretion or error of law by prohibiting Appellant from cross-examining the Appellee through the use of appropriate hypothetical questions at the injunction hearing?

5. Did the trial court commit an abuse of discretion or error of law by prohibiting Appellant, as the party with the burden of proof, to give final closing remarks as a rebuttal?

Appellant's Brief at 2-3.[2]

_____

[2] Appellant acknowledged to the trial court that he is an attorney but was *pro se* in these proceedings. N.T. Injunction Hearing, 1/23/14, at 8. He is *pro se* before this Court as well. We remind Appellant that proceeding *pro se* does not relieve him of his responsibility to comply with the appellate rules relating to briefs and, in particular, the requirements to include a statement of jurisdiction and the order in question. Pa.R.A.P. 2111(a)(1) and (2). Neither appears in his brief filed with this Court.

We first note "that, in general, appellate courts review a trial court order refusing or granting a preliminary injunction for an abuse of discretion." ***Summit Towne Centre, Inc. v. The Shoe Show of Rocky Mount, Inc.***, 828 A.2d 995, 1000 (Pa. 2003) (citations omitted).

> [T]his standard of review is to be applied within the realm of preliminary injunctions as follows:  [W]e recognize that on an appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below.  Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the [trial court].

***Id.*** (quotations and citations omitted).  "Thus, in general, appellate inquiry is limited to a determination of whether an examination of the record reveals that 'any apparently reasonable grounds' support the trial court's disposition of the preliminary injunction request."  ***Id.*** at 1001 (quotations, citations and footnote omitted).

In ***Summit Towne Centre***, our Supreme Court explained the "apparently reasonable grounds" standard as follows:

> In ruling on a preliminary injunction request, a trial court has "apparently reasonable grounds" for its denial of relief where it properly finds that any one of the following "essential prerequisites" for a preliminary injunction is not satisfied. ***See*** . . . ***County of Allegheny v. Commonwealth***, 518 Pa. 556, 544 A.2d 1305, 1307 (1988) ("For a preliminary injunction to issue, every one of the [ ] prerequisites must be established; if the petitioner fails to establish any one of them, there is no need to address the others.").  First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages.  Second, the party must show that

greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits. Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending activity. Sixth and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest.

*Id.* at 1001 (citations omitted).

In his 1925(b) Statement of Matters Complained of on Appeal, Appellant included the two issues dealing with contractual principles that he now asks this Court to consider as the first two issues in this appeal. In doing so, Appellant is asking this Court to inquire into the merits of the controversy. In accordance with the standard announced by our Supreme Court in *Summit Towne Centre*, we decline to do so and instead review the record to ascertain whether there exist any reasonable grounds for the trial court's denial of the injunction.

Addressing the contract issues in the context of the prerequisites for an injunction, the trial court stated:

[Appellant] claims that we based our ruling "on the misplaced belief that contract principles governed this dispute" and also that we abused our discretion "by holding that the fact that [Appellant] had not entered in to a written contract agreement with [Appellees] prevented [Appellant] from being entitled to relief. As previously set forth, we based our denial of his requested preliminary injunction on the fact that [Appellant] did

- 10 -

not satisfy numbers two (2) and six (6) of the necessary prerequisites. We found that there would be substantial harm to the potential buyers as well as to [Bank of America,] the ultimate grantor of the failed mortgage and loan, in stopping the sale from going forward. Additionally, we recognized the adverse impact issuing a preliminary injunction in this case would have on the public interest, as everything dealing with real estate should and must be in writing and the issuance of this injunction would essentially telegraph just the adverse, that a written and presumptively valid agreement for the purchase of real estate could be set aside under similar lingual circumstances. Our brief comments regarding our concern that there was no valid written contract between [Appellant] and any Appellee was an afterthought, questioning the plausibility of [Appellant's] claims. We had no doubts, however, about Abrams' credibility and did not find any of his testimony to be false, hence casting further doubt on [Appellant's] claims. However, we eventually relied on [Appellant's] failure to establish the necessary [prerequisites] as our reason for denying [his] preliminary injunction.

T.C.O., 5/22/14 at 13-14 (footnote omitted).[3]

Our examination of the record, as thoroughly and accurately summarized in the excerpt of the trial court's opinion set forth above, reveals "apparently reasonable grounds" supporting the trial court's denial of the preliminary injunction request. Because reasonable grounds exist to

_____

[3] By footnote, the trial judge explained that he denied the injunction at the conclusion of the hearing based on Appellant's failure to establish the second and sixth prerequisites. However, in the course of analyzing the record for purposes of writing his 1925(a) opinion, he concluded that Appellant failed as well to establish any of the remaining prerequisites. T.C.O., 5/22/14 at 13, n. 8. In light of our Supreme Court's directive that there is no need to discuss the remaining prerequisites after establishing the petitioner's failure to establish any one of them, we shall not address the first, third, fourth and fifth prerequisites here. **See County of Allegheny v. Commonwealth**, 544 A.2d 1305, 1307 (Pa. 1988).

support the order, we conclude the trial court neither abused its discretion nor committed error of law in denying Appellant's petition and, therefore, we shall not interfere with the trial court's decision.  Appellant is not entitled to any relief on his first or second issues.

Appellant's remaining issues raise challenges to evidentiary rulings relating to leading questions, hypothetical questions, and rebuttal during closing argument.  As this Court has recognized:

> The standard of review for a trial court's evidentiary rulings is narrow. The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion.  An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

***Commonwealth v. Hanford***, 937 A.2d 1094, 1098 (Pa. Super. 2007), ***appeal denied***, 956 A.2d 432 (Pa. 2008) (citations, quotation marks and footnote omitted).

Appellant's first evidentiary challenge relates to "repeated leading questions" posed by Appellees' counsel when cross-examining Appellee Abrams who was called by Appellant as an adverse witness.

In its opinion, the trial court explained that Appellant was given much "latitude to fashion his own questions, whether they were leading or otherwise.  Therefore, [Appellees'] counsel's questioning of Abrams was on cross-examination, as he did not call this witness, and, therefore, leading questions were appropriate."  T.C.O., 5/22/14, at 11 (citing Pa.R.E.

611(c)(1) and (2) (the court should allow leading questions on cross-examination and when a party calls an adverse party)).[4] We find no abuse of discretion in the trial court's ruling in this regard.

In **Katz v. St. Mary Hosp.**, 816 A.2d 1125 (Pa. Super. 2003), this Court stated, "The law in this area is clear. The allowance of leading questions lies within the discretion of the trial court and a court's tolerance or intolerance of leading questions will not be reversed absent an abuse of discretion." **Id.** at 1128 (citing **Commonwealth v. Johnson**, 541 A.2d 332 (Pa. Super. 1998)). Moreover, our review of the hearing transcript reveals that counsel for Appellees began his cross-examination of Abrams on page 68 of the hearing transcript. Many of the questions posed are accurately described as leading. However, no objection to the leading nature of the questions was lodged until page 74 of the transcript, after counsel asked and Abrams answered approximately two dozen questions, when Appellant stated, "Objection, Your Honor. I tried to sit back as much as I can, but I'm just going to object to the continuous leading nature of the questions." N.T. Injunction Hearing, 1/23/14, at 74. Appellant's failure to object at any earlier point in the testimony renders his objections waived. **Katz**, 816 A.2d

---

[4] We note that the trial court included the text of Pa.R.E. 611(c) in its opinion but did not include the final sentence of Rule 611(c)(2), which provides that "[a] witness [examined as a hostile witness or an adverse party] should usually be interrogated by all other parties as to whom the witness is not hostile or adverse as if under redirect examination."

at 1128 (citing **Beaumont v. ETL Services, Inc.**, 761 A.2d 166 (Pa. Super. 2000); Pa.R.C.P. 227.1(b)(1)).

However, even if Appellant's objections were not waived, he is not entitled to relief. All testimony elicited from Abrams by Appellees' counsel could have been elicited through questioning that was not leading. Moreover, much of Abrams' testimony in response to questioning by Appellees' counsel simply amplified the testimony elicited in response to questions posed by Appellant during his direct examination that spanned 38 pages of testimony. N.T. Injunction Hearing, 1/23/14, at 30-68. Therefore, even if Appellant's objections were not waived and even if the trial court erred in allowing the three leading questions posed after Appellant objected, that error was harmless. **Katz**, 816 A.2d at 1128-29 (where "none of the elicited responses is of such a character that the information would not have come into evidence but for the leading format . . . any error was harmless"). Appellant is not entitled to relief based on leading questions.

Appellant next argues the trial court abused its discretion or committed error of law by sustaining objections to hypothetical questions Appellant posed to Abrams. In the course of questioning Abrams as on cross-examination, Appellant asked:

> If you were in a scenario where you just represent the seller, there's no dual representation as there was here, and somebody comes in with an offer that's below the asking price, and another potential buyer comes in with an offer that is significantly above the asking price, do you typically counter the higher offer that come[s] in at a number that would be within the asking price

range and within the range of what the property would be valued at, but still higher than the other offer?

N.T. Injunction Hearing, 1/23/14, at 61.[5]   Counsel for Appellees objected and the trial court sustained the objection on the grounds the hypothetical assumed facts not in evidence and irrelevant to the proceedings.   The trial court commented, "I guess the early bird here who was willing to submit an offer before looking at the property, so to speak, other than that initial look-through, is the one that got the worm."  *Id.* at 62.

In its opinion, the trial court explained that "hypothetical questions are proper only with expert witnesses."  T.C.O., 5/22/14, at 11 (citing Pa.R.E. 702; *O'Malley v. Peerless Petroleum, Inc.*, 423 A.2d 1251 (Pa. Super. 1980); *SEPTA v. W.C.A.B.*, 477 A.2d 9, 12 (Pa. Cmwlth. 1984).  "Even so, '[h]ypothetical questions must be based on matters which appear of record and on facts which are warranted by the evidence."  *Id.* at 11-12 (quoting *SEPTA*, 477 A.2d at 12).   While hypothetical questions are most often employed in the questioning of expert witnesses, it is true under all

_____

[5] In his brief, Appellant sets forth four additional "hypothetical questions" disallowed by the trial court.  Appellant's Brief at 21.  While we do not necessarily concur in Appellant's characterization of these questions as "hypothetical," *e.g.,* asking Abrams if he "believe[d] that at all times [Abrams] acted in the best interest of the bank" or "[h]ow long it would have taken [Abrams] to call [Appellant's agent] and tell him the property was listed," we do not believe that the questions are based on "material" or "uncontradicted" facts of record.  Further, the trial court sustained objection to those four "hypothetical questions" but did not state his reasons for doing so and did not suggest that the rulings had anything to do with hypothetical questions.

circumstances that "[a] hypothetical question need not contain all the facts of the case, but only those which are material and uncontradicted." ***O'Malley***, 423 A.2d at 1259.

Appellant contends the hypothetical question quoted above was proper "as supported by the facts and the record. Namely, [A]ppellant had indeed made an offer above asking price but . . . [A]ppellee sold the property to his own client for far below the asking price," resulting in a higher commission to Abrams and a lower sale price to his client, Bank of America. Appellant's Brief at 20. Appellant established through his questioning of Abrams that Abrams received a higher commission and Bank of America netted a lower sale price as a result of the sale to other buyers. In essence, that was what Appellant was trying to establish with the hypothetical question, and he was able to establish those facts through testimony properly elicited from Abrams. The problem with the hypothetical is that it included "facts" that were not established by the testimony. For instance, Abrams did not represent only the seller in this case. The offer that was presented below the asking price was the only offer on the table when presented to the seller, Bank of America, and it was accepted weeks before Appellant visited the property and presented an offer. Further, the accepted offer included financing with a construction loan whereas Appellant's offer included a conventional mortgage that could raise underwriting concerns because of the

appraised value of the property and the financing required for repairs needed for the property. N.T. Injunction Hearing, 1/23/14, at 57-61.

We find no abuse of discretion on the part of the trial court for sustaining the objection to a hypothetical question based on facts that do not appear of record and are not warranted by the evidence. Appellant's fourth issue fails for lack of merit.

In his fifth and final issue, Appellant argues the trial court abused its discretion or committed error of law by prohibiting Appellant, as the party bearing the burden of proof, from providing final closing remarks as a rebuttal. Appellant acknowledges that he was able to present closing argument to the trial court at the conclusion of testimony. However, based on the closing remarks offered by Appellees' counsel, Appellant sought to offer rebuttal. The trial court denied him that opportunity, noting the case was not in federal court and the trial court was not going to "have back and forth." N.T. Injunction Hearing, 1/23/14, at 82. When Appellant asserted that Appellees' counsel misrepresented one of Appellant's claims in his closing argument, the trial court acknowledged he "wasn't paying much attention anyway. I already made my mind up based on the standards that are required for the issuance of a preliminary injunction." *Id.* The trial court then proceeded to explain his conclusion that Appellant failed to satisfy the second and sixth prerequisites for granting a preliminary injunction. *Id.* at 82-84.

- 17 -

Appellant argues that Pa.R.C.P. 225 supports his contention that he should have been provided the opportunity to present rebuttal. Appellant's Brief at 23. However, Rule 225 simply authorizes attorneys for each party to make an opening address to a jury and address the jury after the close of testimony. The Note to the rule indicates that the trial court "by local rule or otherwise" may regulate the number, length and order of addresses." Pa. R.C.P. 225, *Note*.

Appellant quotes the Buck County Rules and, in particular, Local Rule 223(f), in support of his position. That rule provides:

> (f) At the trial of any cause, the party having the affirmative of the issue on the pleadings shall open the case and counsel for the defendant, at his option, may make his opening address before any testimony is taken on behalf of the plaintiff. This order shall be reversed in making closing arguments to the jury, except in cases where the defendant offers no evidence.

Bucks Cty. R.C.P. 223(f).

Clearly, the Buck County rule provides for the order of closing "to the jury," and does not address bench trials or preliminary injunction hearings. Moreover, at the conclusion of testimony, the trial court asked Appellant if there was anything else he wanted to present. Appellant responded, "Judge, I will be under one minute because I know we went over everything at length. . . . So just my closing remarks, if a minute at most." N.T. Injunction Hearing, 1/23/14, at 79. Appellant immediately proceeded with his closing argument. He did not suggest to the trial court that Appellee was required to present closing argument first, nor did he object when counsel

- 18 -

for Appellee offered his closing remarks upon completion of Appellant's argument.

Appellant did not preserve any objection relating to closing arguments. Moreover, the rule upon which he relies dictates the order of closing arguments presented to a jury. Finally, the trial court acknowledged a lack of attention to the closing arguments in any event. We do not find that the trial court abused its discretion or committed error of law by precluding Appellant's closing argument rebuttal. Any error, if error occurred, was harmless. Appellant's fifth issue does not afford him any grounds for relief.

Because Appellant has not demonstrated any basis for relief, we shall not disturb the ruling of the trial court denying Appellant's petition for preliminary injunctive relief.[6]

_____

[6] Appellees submitted that this appeal should be dismissed as moot because the subject property was conveyed to its current owner on February 24, 2014. Appellees' Brief at 7-8 (referring to an August 1, 2014 listing report in Appellees' Reproduced Record that purports to reflect a February 24, 2014 sale date). In support of their contention, Appellees cite various cases and Pa.R.A.P. 1972(a)(4) ("Except as otherwise prescribed by this rule, . . . any party may move: (4) to dismiss for mootness."). We recognize that appellate courts do not decide moot issue and that an appeal is subject to dismissal if an event occurs that renders the grant of requested relief impossible. **Delaware River Preservation Co., Inc. v. Miskin**, 923 A.2d 1177, 1183, n.3 (Pa. Super. 2007). However, there is no motion before us as authorized by Pa.R.A.P. 1972 (a)(4) and Appellees have not provided reference to anything that might appear in the certified record to warrant dismissal as moot *sua sponte*. **See** Pa.R.A.P. 1921, *Note* ("An appellate court may consider only the facts which have been duly certified in the record on appeal. **Commonwealth v. Young**, [] 317 A.2d 258, 264 (1974)."). Further, it is not the duty of this Court to scour the record on a
*(Footnote Continued Next Page)*

Order affirmed.  Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/4/2014

---

*(Footnote Continued)*

party's behalf and we decline to do so.  ***See Hayward v. Hayward***, 868 A.2d 554, 558 (Pa. Super. 2005) (citations omitted).  In the alternative, Appellees suggest the appeal should be dismissed for lack of jurisdiction for failure to name an indispensable party to the action, *i.e.*, the current owner. Appellees' Brief at 8-9.  Again, there is no motion before us and the record does not include any information relating to a "current owner."  Therefore, we decline Appellees' invitation to dismiss the appeal for mootness or failure to include an indispensable party.