**Mir M. YOSUF, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 83–1819.**

United States District Court,
M.D. Pennsylvania.

June 20, 1986.

John M. Humphrey, Rieders, Travis, Mussina, Humphrey & Harris, Williamsport, Pa., Robert Greenspan, Landover, Md., for plaintiff.

James W. Walker, Asst. U.S. Atty., Scranton, Pa., Royce C. Lamberth, Charles F. Flynn, Asst. U.S. Attys., Stanley S. Harris, U.S. Atty., Washington, D.C., for defendant.

## OPINION

MUIR, District Judge.

### I. Introduction.

On June 9, 1983, Yosuf M. Mir filed the complaint in this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* in the United States District Court for the District of Columbia. By order of December 2, 1983, the Honorable Thomas Penfield Jackson transferred this action to this Court. Mir's complaint arose from an incident in which Mir fell at the Allenwood Federal Prison Camp, Montgomery, Pennsylvania. As a result of the fall, Mir injured his left arm, wrist, and hand. Mir alleges that the Bureau of Prisons refused him adequate and proper treatment for the injuries sustained by him. The liability phase of the case was tried to the Court from January 16 through January 29, 1986. By opinion of March 7, 1986, 642 F.Supp. 415, we concluded that the Bureau of Prisons was a proximate cause of the injury to Mir and liable for damages flowing from that injury.

The damages stage of this case was tried to the Court from May 20, 1986 through May 27, 1986. Our findings of fact, conclusions of law, and discussion as to damages follow. Our Findings of Fact beginning with No. 138 are sequential to the 137 facts found in the liability stage of this matter. Those facts which are undisputed will be followed by "U."

### II. Findings of Fact.

138. Mir's severely decreased use of his left hand has continued up to the present despite the prescription of isometric exercises and an arm immobilizer.

139. Mir suffers from numbness in the fingers of his left hand, painful limitation of motion of the fingers and wrist of the left hand, and occasional headaches.

140. Mir keeps his left wrist and fingers in a flexed position and is unable readily to open the fingers or bend the wrist. The fingers can be opened passively and the wrist moved passively but such movements are painful. For all practical purposes, Mir is currently suffering from a 100 percent disability of the left hand and wrist and a substantial disability of the arm.

141. Mir's inability to use his left hand is at least partially psychogenic.

142. Mir has a chronic pain type syndrome and a complex problem with the left upper extremity.

143. The objective medical evidence does not account fully for the stiffness and lack of motion in the wrist and fingers.

144. Mir's treating physician, Orthopedic Surgeon Dr. Douglas Sanderson, recommends that Mir receive repeat EMG studies, followed by surgery to release the left median and ulnar nerves which, if successful, will reduce by approximately 50 percent the pain and numbness which Mir presently has in his left hand and wrist. (Undisputed, hereafter "U").

145. The decreased discomfort resulting from successful surgery may better enable Mir to perform exercises designed to strengthen the muscles in the left wrist and hand and otherwise to carry out a course of rehabilitation.

146. Although Mir testified that he has exercised his hand and wrist since release from prison, he has made no ascertainable progress, and indeed appears to have regressed, which is due in large part to his psychogenic difficulties and low threshold for pain.

147. Even with the recommended course of treatment, there is little chance that Mir will regain 100% function of his left hand and wrist.

148. With the recommended course of medical treatment, the chances are fair that Mir will regain substantial function in his left hand and wrist such that he may be able to use that hand and wrist for short periods of time in vocational and avocational pursuits.

149. If, promptly upon his release from custody, Mir had obtained proper medical treatment, he should have regained substantial use of his left hand and wrist.

150. Mir's explanation of why he did not seek a more rigorous course of treatment was not credible.

151. Mir's treating physician feels that, at best, Mir will be able to perform only light or sedentary duties, and in a position where extended use of the left upper extremity is not required. (U)

152. In addition to the medical treatment recommended, both the treating physician and a vocational psychologist who examined Mir recommend that he undergo psychological counselling for a period from six months to one year. (U)

153. For several months following his wrist injury on or about August 31, 1980, and while incarcerated in the segregation unit at the Lewisburg Penitentiary, Mir suffered from pain in his left wrist, as well as numbness in the fingers of the left hand and in the left hand itself. The pain was exacerbated by the refusal of the medical personnel to give Mir pain medication.

154. During these initial months, the pain and numbness caused frustration in Mir and affected his ability to sleep.

155. After several months, the pain decreased, but Mir continued, and continues through the present, to have pain upon movement of the left fingers and wrist.

156. Changes in the weather aggravate somewhat the pain in Mir's left fingers and wrist.

157. Mir suffers from the numbness in the fingers of the left hand which is a constant source of irritation and which adversely affects his sleep.

158. Mir's attempts to minimize the pain by keeping his left hand flexed and without movement has also resulted in general decreased use of the entire left arm.

159. Presently, Mir suffers from occasional severe headaches as a result of his injury.

160. From the time of his accident through his release from custody in January, 1983, and from his release through the present, Mir has not used his left hand for anything except the bracing of objects.

161. In August, 1985, Mir's treating physician prescribed an arm immobilizer which is a sling-type device. Mir wears the arm immobilizer most of the time, including while sleeping, which is more often than prescribed by his physician.

162. The pain and loss of use of the left hand and wrist have had various psychological effects upon Mir such as anger, frustration, and occasional depression.

163. Prior to his disability, Mir actively engaged in various athletic pursuits such as weight lifting, swimming, basketball, tennis, and soccer.

164. Prior to his disability, Mir actively engaged in various woodworking and home remodeling projects.

165. As a result of his disability and pain, Mir is no longer vigorously able to pursue any of these activities.

166. As a result of the inability to use his dominant hand, Mir has difficulty in performing such simple tasks as dressing himself, using eating utensils, writing, performing routine household chores and household maintenance.

167. Mir's disability has also interfered with his religious activities and customs. As a "Said" (direct descendant of Mohammed) in the Islamic faith, Mir is particularly affected by the inability to use his left hand. In the Islamic culture, the left hand is used for toilet purposes while the right hand is used for eating out of common bowls or plates. Thus, an individual without the use of his left hand is not necessarily welcome in the higher circles of Islamic society. Additionally, followers of Islam pray five times per day with head and both hands on the floor. Mir's inability to place his hands on the floor while in the praying position has caused him to withdraw from engaging in group religious activities in which he formerly engaged.

168. Mir's pain, suffering and loss of enjoyment of life will continue indefinitely.

169. Even if the medical treatment recommended by his physician achieves the maximum expectations, Mir will have some numbness in his fingers and will have dis-

comfort upon using his left hand for long periods of time.

170. Mir has been taking pain medication since he began treating with Dr. Sanderson, and will continue on that medication at least through the recommended surgery and recovery therefrom. (U)

171. During the time that Mir's left hand has been in the flexed position, from a few weeks after the August 31, 1980 accident through the present, said position of the hand constitutes a disfigurement.

172. Mir's disfigurement may be eliminated or reduced if the recommended medical treatment achieves its maximum benefits.

173. In a letter submitted to the court which sentenced Mir in September, 1979, the individual who supervised Mir as an engineering aide described him as an outstanding employee who was honest, open, hard working, and quite reliable, and one the supervisor would not hesitate to rehire.

174. Because of the disability of his left hand and wrist, Mir has been unable to engage in any of the above occupations, from the time of his release from custody in January 1983 through the present.

175. Mir is currently working as a telephone answering clerk for the woman he intends to marry at the minimum wage rate of $3.35 per hour.

176. Mir has applied to some universities and embassies for a job utilizing Mir's ability to speak foreign languages. He has been refused employment.

177. Even with the maximum improvement which could be expected from the suggested medical treatment, Mir's earning capacity will continue to be low because of his physical disability, educational disadvantage, cultural differences, prison record and communication deficiency.

178. While Mir was in the United States during the years 1971 and until his incarceration in August, 1979, he was supported primarily by contributions or an allowance from his father, a wealthy man in Afghanistan.

179. As an immigrant to the United States, he has not been able to integrate himself well into his adopted culture.

180. Mir has had difficulty with vocational adjustments as well as personal adjustment.

181. In late 1979, the Soviet Union invaded Afghanistan, and from that time through the present, Mir has had no contact with his immediate family and has not received the monetary support which his father had provided to him prior to the invasion.

182. Because of the loss of contact with his family and the loss of the financial support, while incarcerated at Allenwood Federal Prison Camp in 1980 and prior to the injury to his wrist, Mir was forced to consider how he would support himself upon his release from incarceration.

183. While incarcerated at Allenwood Prison Camp in 1980, Mir became good friends with a fellow inmate by the name Carlo Castoro, who had an interest in a machine shop named Minutemen Precision Machining, Inc., located on Long Island, New York. (U)

184. During 1980, Mir and Castoro discussed their futures, and Castoro urged Mir to come to Long Island to learn the machinist trade, and offered Mir a job with Minutemen as a machinist trainee. (U)

185. In February, 1982, Castoro formalized the above noted discussions by writing Mir and indicating upon Mir's release from incarceration, he would be hired as a machinist trainee at Minutemen if he were physically fit. (U)

186. Upon Castoro's release from incarceration in approximately August, 1980, Castoro was the Vice-president and 30 percent shareholder of Minutemen. The remainder of the shares were owned primarily by Castoro's brother.

187. In August 1985, Castoro left Minutemen to pursue other business opportunities in a Long Island, New York company performing similar work. He remains a 30 percent shareholder in Minutemen.

188. Part of Castoro's duties while Vice-president of Minutemen was to hire all personnel, including machinist trainees.

189. A machinist trainee was expected to learn to use milling machines and other types of machines used in a machine shop. (U)

190. Machinist trainees and machinists have to have full use of both arms and hands, and Mir's disability has rendered him unable to accept the opportunity offered by Mr. Castoro. (U)

191. Prior to his incarceration in 1979, Mir held a variety of jobs including the following: (1) hotel desk clerk and bellhop with wage rate of approximately $11,400.00 annually which would have paid approximately $14,400.00 as of 1984; (2) laborer loading and unloading trucks at an annual rate of approximately $16,800.00, which would have paid approximately $19,800.00 as of 1984; (3) an engineering aide with a surveying company with a wage rate of approximately $10,300.00 which would have paid approximately $12,000.00 as of 1984. (U)

192. Mir's prior work history establishes that Mir has not retained any form of employment for a sustained period of time. It is unlikely that Mir would remain employed in any one place for a long time.

193. Mir never completed a full degree program at any of the several schools in which he enrolled while in the United States.

194. Mir lived in several states since he came to the United States.

195. If Mir had been able to accept the machinist trainee position offered by Castoro, he would have started off in January, 1983 at $6.00, with annual increases of $2.00 per hour until he achieved the maximum rate of $18.00 per hour. (U)

196. In addition to these hourly rates for a 40 hour week, machinists at Minutemen were expected to work approximately 10 hours overtime per week at "time and one-half" the hourly wage.

197. Mir's prior work history makes it highly unlikely that he would have worked 10 hours a week overtime.

198. Using the above undisputed rates, had Mir not suffered from the disability, he could have expected the following annual salaries for the six years it is stipulated by counsel that he might reasonably work at this job, for 52 weeks each year at 40 hours per week for the years ending in the months set forth below, which figures do not reflect fringe benefits:

| | | |
|---|---|---|
| (a) | January 1984 at $6.00 per hour | $12,480.00 |
| (b) | January 1985 at $8.00 per hour | 16,640.00 |
| (c) | January 1986 at $10.00 per hour | 20,800.00 |
| (d) | January 1987 at $12.00 per hour | 24,960.00 |
| (e) | January 1988 at $14.00 per hour | 29,120.00 |
| (f) | January 1989 at $16.00 per hour | 33,280.00 |
| (g) | January 1990 at $18.00 per hour | 37,440.00 |
| | Total | $174,720.00 |

199. Based on Mir's former jobs and the in-court credible testimony of Deborah S. Harder, R.N., and James D. Rodgers, Ph.D., Mir's earning capacity without disability is $16,113.00.

200. The jobs Mir held prior to incarceration reflect his earning capacity before his injury.

201. Mir's post-disability earning capacity, based on the videotape testimony of Dr. Donald E. Jennings, and the in-court testimony of Deborah S. Harder, R.N., Ira B. Gensemer, Ed.D., and James D. Rodgers, Ph.D. is $12,431.00 a year.

202. Based on Mir's past work experience and the fact that the machinist's trade is a volatile enterprise wherein many machine shops close, causing machinists to have to find other employment in the industry, had Mir not suffered from the disability, he could have expected a salary of $16,113 for the period January 1990 through January 2017 (his work life expectancy of 65 years of age) or $435,051.00.

203. The above wage calculations represent Mir's earning capacity had he not suffered the disability to his left upper extremity.

204. Mir was born in August 1952 and was thirty years old at the time of his release from custody in January, 1983.

205. Castoro felt that Mir, pre-injury, was fully capable of learning the machinist trade and earning the above amounts, and that in fact he was much more capable than the other machinist trainees which Castoro had hired. Castoro also indicated that after several years working as a machinist, he felt that Mir could have his (own) machine shop and obtain subcontracting work, and that Castoro and Mir had discussed such a possibility. If these plans had come to fruition, Mir's earning capacity would be substantially above the amounts noted previously. (U)

206. Comparing Mir's current earning capacity with the earning capacity he would have had had he been able to accept the position as a machinist for the first six years as stipulated and thereafter at a rate more reflective of his ability, Mir suffered and will suffer the following loss in earning capacity resulting in part from the Defendant's negligence:

| (a) | January 1983–January 1984 | $12,480.00 −12,431.00 | |
| | | | $ 49.00 |
| (b) | January 1984–January 1985 | $16,640.00 −12,431.00 | |
| | | | $ 4,209.00 |
| (c) | January 1984–January 1986 | $20,800.00 −12,431.00 | |
| | | | $ 8,369.00 |
| (d) | January 1986–January 1987 | $24,960.00 −12,431.00 | |
| | | | $12,529.00 |
| (e) | January 1987–January 1988 | $29,120.00 −12,431.00 | |
| | | | $16,689.00 |
| (f) | January 1988–January 1989 | $33,280.00 −12,431.00 | |
| | | | $20,849.00 |
| (g) | January 1989–January 1990 | $37,440.00 −12,431.00 | |
| | | | $25,009.00 |
| (h) | January 1990–January 2017 | $16,113.00 −12,431.00 | |
| | | | $ 3,682.00 × 27 (yrs.) $99,414.00 |

207. Using the above figures, Mir's past lost earning capacity January 1983 through January 1986 has been $12,627.00.

208. Mir's future lost earning capacity from January 1984 through his work life expectancy of January, 2027, is $174,-490.00.

209. With respect to future medical costs, the recommended surgery would cost $1,250.00 for the surgeon's fee, $3,500.00 for the hospital costs, plus $250.00 for the EMG study, for a total of $5,000.00 connected with the suggested surgery. (U)

210. Mir would require at least eight follow-up visits per year with his treating physician for a period of two years at $25.00 per visit, costing a total of $400.00.

211. It has also been suggested that Mir have psychological counselling for a period of six months to one year, which would cost approximately $2,000.00. (U)

212. Mir should have the suggested psychological counselling.

213. In sum, the damages suffered by Mir as a result of the Defendant's negligence, not taking into account the duty to mitigate, are as follows:

| (a) | past lost earning capacity | $ 12,627.00 |
| (b) | future lost earning capacity | 174,490.00 |
| (c) | future medical expenses | 7,400.00 |
| (d) | disfigurement, pain, suffering and loss of enjoyment of life. | 50,000.00 |
| | TOTAL: | $244,517.00 |

### III. Discussion.

### A. Background.

By opinion and order of March 7, 1986, we found that the medical personnel of the United States Bureau of Prisons were negligent in failing to exercise the degree of medical care which would be exercised by a reasonable man in the medical profession. We found that this negligence was a substantial cause of the injury to Mir's hand and wrist. Thus, under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, the United States is liable. We held that Pennsylvania law applies. *Feeley v. United States*, 337 F.2d 924 (3d Cir.1964).

Damages are to be awarded as compensation for an injury substantially caused by the negligence or tortious conduct of another. *Layman v. Doernte*, 405

Pa. 355, 175 A.2d 530 (1961). Additionally, an injured party is required to mitigate his damages. *Lewis v. Pennsylvania Railroad Co.,* 100 F.Supp. 291, 294 (E.D.Pa. 1951); *Potts v. Guthrie,* 282 Pa. 200, 127 A. 605 (1925). For example, if an injury may be cured or reduced by a surgical operation, then failure to submit to the operation may be considered in mitigation of damages. *Id., see also Martin v. Pittsburgh Railways Co.,* 238 Pa. 528, 86 A. 299 (1913). Mir has requested damages for future medical expenses, past and future pain, suffering, disfigurement, and loss of enjoyment of life, and past and future lost earning capacity. We shall discuss each of these categories of damages *seriatim.*

### B.  Future Medical Expenses.

■ The standard for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* is compensatory. *Barnes v. United States,* 685 F.2d 66 (3d Cir.1982). The objective of compensatory damages in tort is to place the plaintiff in the same position in which he would have been if his injury had not occurred. *Id.* We shall apply this standard to Mir's request for future medical expenses. The testimony of Dr. Sanderson, Mir's treating physician, is that surgery for Mir's wrist would cost approximately $5,000.00. Furthermore, Mir would need at least eight follow-up visits per year for a period of two years for a total of $400.00. Mir should also have psychological counselling for a period of 6 months to a year which would cost approximately $2,000.00. The fact that the surgical and psychological damages amount to $7,000.00 is undisputed by counsel. Only the $400.00 for follow-up visits is disputed. Follow-up visits would be necessary and the estimated charge is reasonable.

### C.  Disfigurement, Pain, Suffering, and Loss of Enjoyment of Life.

■ In addition to compensation for reasonable medical expenses, a plaintiff is entitled to compensation for past, present, and future pain, suffering, disfigurement,

and loss of enjoyment of life. *McDonald v. United States,* 555 F.Supp. 935 (M.D.Pa. 1983). Although the medical evidence did not account for the degree of pain Mir claims to have suffered and to suffer today, it is manifest that Mir feels pain in his left wrist and hand. Furthermore, even after Mir has the recommended surgery he will continue to have some degree of pain and numbness.

In addition to pain and suffering, Mir claims that the holding of his hand in a clenched position and the almost constant use of a sling constitutes a disfigurement. Although we are of the opinion that Mir's injury has resulted in a disfigurement, the disfigurement is modest. If Mir follows the treatment schedule prescribed by Dr. Sanderson, the disfigurement he presently suffers will be substantially reduced.

The last factor we consider in our awarding of damages under this section is Mir's loss of enjoyment of life. Specific elements which may enter into the award of damages for loss of enjoyment of life include Mir's present and future inability to engage in recreational, religious, and household activities. *Downie v. United States Lines Co.,* 359 F.2d 344 (3d Cir. 1966), *cert. denied,* 385 U.S. 897, 87 S.Ct. 201, 17 L.Ed.2d 130 (1966). Mir formerly engaged in various athletic pursuits such as weightlifting, swimming, tennis, and soccer. Additionally, Mir enjoyed woodworking and home remodelling. Furthermore, Mir's religious habits and Islamic customs such as group prayer and eating out of common bowls have been inhibited by his injury. Although the recommended surgery and course of recuperation will likely make it possible for Mir once again to engage in the religious practices and Islamic customs as well as some of the sports and household duties he formerly enjoyed, it is unlikely that Mir will be able to pursue such things as tennis, weightlifting, basketball, or heavy household chores.

■ For the above reasons and especially because of the several months Mir spent in the segregation unit of the United States Penitentiary at Lewisburg, Pennsyl-

vania with little or no pain medication, we are of the opinion that $50,000.00 will adequately and fairly compensate Mir for pain, suffering, disfigurement or loss of enjoyment of life.

### D. Lost Earning Capacity.

Under Pennsylvania law, when an injury lessens future earning power, a recovery may be had for the probable loss of the future earnings. *Kaczkowski v. Bolubasz*, 491 Pa. 561, 566 n. 7, 421 A.2d 1027 (1980). We must determine to what extent there has been a loss of earning power. *Mazi v. McAnlis*, 365 Pa. 114, 121, 74 A.2d 108 (1950). We do not discount future lost earnings. *Kaczkowski v. Bolubascz*, 491 Pa. 561, 421 A.2d 1027 (1980). An injured person is entitled to recover the difference between what he could reasonably have been expected to make without the injury and what he could reasonably be expected to make with the injury over the period he could reasonably be expected to remain in the work force. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 2548–2551, 76 L.Ed.2d 768 (1983); *Downie v. U.S. Lines Co.*, 359 F.2d 344 (3d Cir.1966), *cert. denied*, 385 U.S. 897, 87 S.Ct. 201, 17 L.Ed.2d 130 (1966).

In applying these tests, we first must determine what Mir's earning capacity would have been without the injury. Generally, the courts look to Plaintiff's past wages to determine what his earning capacity would have been without the injury. *O'Malley v. Peerless Petroleum, Inc.*, 283 Pa.Super. 272, 423 A.2d 1251 (1980). Mir contends that his past wages are not reflective of his earning capacity without the injury. Mir bases his assertion on the fact that he was primarily supported by his father in Afghanistan before Afghanistan was invaded by the Russians. Thus, Mir contends that his past jobs are reflective only of his ability to earn extra income. Mir contends that his past jobs were taken primarily because they were a learning experience and might have been useful to Mir if he returned to Afghanistan. We disagree. Mir's testimony regarding his seeking employment merely as a form of education which might be useful to him upon a return to Afghanistan and as a method of experiencing American culture is not convincing. We believe Mir's past employment is an accurate reflection of his earning capacity without the injury. We are of the opinion that Mir, although a diligent employee while employed in a certain job, was a drifter. He went from job to job, state to state, and school to school. He never spent a long period of time steadfastly striving to attain a stated goal. To date, he has not completed his course work for a degree although only a short term of residence at the school is required nor has he become assimilated into the American culture which Mir claimed was a purpose of his going from job to job. Additionally, Mir has not learned how to communicate with ease in the English language which also makes him less employable. We find Mir's earning capacity without an injury to be $16,113.00 per annum. This sum takes into account wages earned in past employment.

Mir cited to us several cases which stand for the proposition that future lost earning capacity may be based upon wages for employment other than the employment in which the Plaintiff was engaged in at the time of injury or prior thereto. *See e.g. O'Malley v. Peerless Petroleum, Inc.*, 283 Pa.Super. 272, 423 A.2d 1251 (1980); *Springer v. George*, 403 Pa. 563, 170 A.2d 367 (1961). In those cases, the plaintiff was actively engaged in the pursuit of a certain goal and likely to ascertain that goal. Mir was not steadfastly pursuing any goal which it can be reasonably said that he would attain. There was no evidence in the record from which we could reasonably infer that Mir's earning capacity without injury should be based on factors other than what he has earned in previous employment.

$16,113.00 is an accurate reflection of Mir's annual earning capacity without the injury. Nonetheless, we utilized a higher figure for the first six years after Mir's release from federal custody because the

United States stipulated that Mir could have earned higher amounts of money had he accepted a position offered to him as a machinist. We are of the opinion that we are bound by this stipulation, although we think that it is unlikely that Mir would persevere at the extremely difficult and dirty task of learning the machinist's trade, based on Mir's past vocational and educational record of not staying at any one institution or job for a long period of time. Furthermore, if we assumed Mir would become a machinist then a wage rate reflective of the national average for machinists should be used rather than a particular wage at a particular machine shop. A wage rate similar to the national wage rate was, in fact, utilized by the expert witnesses to ascertain that $16,113.00 is Mir's earning capacity without injury.

After figuring the amount Mir could have earned without the injury, we then must ascertain his earning capacity with the injury. Mir asserts that his earning capacity is minimum wage and will never be more than minimum wage. This he bases largely on the fact that he has been rejected by several potential employers, including some universities and embassies, and the fact that he is presently employed at the minimum wage as a telephone operator. We do not think it is dispositive that Mir is presently being paid minimum wage as a telephone operator. Mir's attempts at employment have been few and have been for professional positions. That one has been refused for employment in a professional position does not automatically relegate one to the minimum wage when numerous jobs exist in non-professional employment at a wage above the minimum wage. We found the testimony of Deborah S. Harder, R.N., Ira B. Gensemer, Ed.D., and James D. Rodgers, Ph.D. to be an accurate reflection of jobs Mir could hold and of Mir's post disability earning capacity for those jobs. We have taken that figure ($12,431.00) and subtracted it from the amounts it was stipulated that Mir could make without the injury and the amount we found that it was reasonable Mir could make without the injury in arriv-

ing at a total for past lost earning capacity of $12,627.00 and future lost earning capacity of $174,490.00 for a grand total of $187,117.00.

### E. Mitigation.

We now move to the question of mitigation. After determining the amount of damages due the plaintiff, it is important to ascertain whether the plaintiff has met his duty of mitigation. *Hannon Motor Lines, Inc. v. Liberty Mutual Insurance Co.*, 214 F.Supp. 250, 257 (W.D.Pa. 1963). The failure to mitigate damages results in a proportionate reduction in Plaintiff's damages. *Vizzini v. Ford Motor Co.*, 569 F.2d 754, 766 (3d Cir.1977). *Cf. McCown v. International Harvester Co.*, 463 Pa. 13, 342 A.2d 381 (1975). Mitigation of damages is akin to apportionment of damages. *Vizzini*, 569 F.2d at 770 (Weis, J. concurring). One factor to be considered in determining whether a plaintiff has properly mitigated is whether he has timely submitted to safe surgical operations recommended by physicians. *McGinley v. United States*, 329 F.Supp. 62 (E.D.Pa.1971); *Lewis v. Pennsylvania R. Co.*, 100 F.Supp. 291, 294 (E.D.Pa.1951). We are of the opinion that it is inconsistent for Mir to argue that the lack of surgery and relatively few sessions of therapy constituted negligence on behalf of the Bureau of Prisons when it was treating Mir but that Mir's not obtaining surgery upon release from the Federal Prison System and not rigorously pursuing an active course of therapy constituted conservative treatment on his part and not a failure to mitigate. We find that Mir's failure to obtain the surgery recommended or to enroll in a course of rigorous therapy is a failure of the duty to mitigate. Mir testified that he does engage in some isometric exercises at home. Further, Mir stated at trial that he did not obtain surgery because of the cost and because the hospital to which he applied would not have the surgery performed without proper security. We find Mir's testimony to be less than convincing. Mir has since the injury refrained from using the hand causing it to atrophy. He

has been out of custody since January 1983 and while the medical personnel at the Bureau were negligent in part because they did not exercise Mir's hand, arm and wrist. Mir bears the burden for lack of exercise of his hand, arm and wrist since he left custody. Although a highly qualified medical doctor at Geisinger Medical Center found him to be malingering, it is our view that Mir, although not malingering, is very close to it. There is no excuse for Mir not to have exercised his hand since release from custody. In addition to failing to mitigate after release from prison, it is noteworthy that Mir also failed to mitigate while incarcerated. Specifically, he was hostile to the physician's assistants at Allenwood, initially refusing proposed X-rays, and so hostile to Dr. Donovan when taken to the Doctor's office in Lewisburg by the prison authorities that the Doctor concluded he was unable to treat him and suggested referral to the Medical Center for Federal Prisoners at Springfield, Missouri. Furthermore, after Mir was sent to Springfield, Missouri, Mir missed several therapy sessions without proffering a credible excuse to the Court. Mir failed in his duty to mitigate his damages upon release from federal custody. Thus, we shall reduce the award by twenty five percent. We are of the opinion that this amount accurately reflects an apportionment of losses based upon the failure to mitigate.

### IV. Conclusions of Law.

1. The United States Bureau of Prisons prior to reduction for failure of Mir to mitigate is liable under the Federal Torts Claims Act, 28 U.S.C. § 2671, *et seq.* to Yosuf M. Mir for the following damages:

| | | |
|---|---|---|
| 1.1 | Past lost earning capacity | $ 12,627.00 |
| 1.2 | Future lost earning capacity | $174,490.00 |
| 1.3 | Future medical expenses | $ 7,400.00 |
| 1.4 | Compensation for pain, suffering, disfigurement, and loss of enjoyment of life | $ 50,000.00 |
| | Total | $244,517.00 |

2. Yosuf M. Mir failed to mitigate damages.

3. A fair reduction from the award for failure to mitigate is twenty five percent.

4. Mir is entitled to an award of $183,387.75.

An appropriate order will be entered.