Michael **MILLER**, Plaintiff–Appellant,

v.

Jeffrey **LOVETT**, Robert Nappe, Individually and in their official capacities as Officers in the Police Department of East Haven, Connecticut, Defendants–Appellees.

No. 1231, Docket 89–7101.

United States Court of Appeals, Second Circuit.

Argued May 19, 1989.

Decided July 17, 1989.

Karen Lee Torre, New Haven, Conn.
(Williams & Wise, of counsel), for plaintiff-
appellant.

Hugh F. Keefe, New Haven, Conn. (Lynch, Traub, Keefe & Errante, Michael J. McClary, of counsel), for defendants-appellees.

Before LUMBARD, PRATT, and ALTIMARI, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

In the early morning hours of August 2, 1987, Michael Miller suffered scalp lacerations and other injuries as he was arrested by two officers of the East Haven, Connecticut, Police Department. Miller filed suit, alleging under 42 U.S.C. § 1983 that the officers used excessive force in violation of his constitutional rights, and under Connecticut law that they committed the torts of assault and battery and negligence. After the district court declined to exercise pendent jurisdiction over the state-law claims, trial of the federal claim resulted in a jury verdict in favor of the police. We reverse and remand because the court mistakenly instructed the jury to consider the subjective state of mind of the officers in determining whether they had used excessive force, gave a confusing, prejudicial charge concerning a plaintiff's duty to mitigate damages, and abused its discretion in dismissing Miller's pendent claims.

## BACKGROUND

The events leading to Miller's altercation with the police began at a party in a residential section of East Haven on the evening of August 1, 1987. At some point during the night, a fight broke out between the host and one of Miller's friends, Damien Conner. Miller succeeded in separating the combatants and, accompanied by Conner, left the party in Conner's car. Although Conner initially said that he wanted to go home, he soon turned the car back in the direction of the party, telling Miller that he was "going to go back there and finish this". Miller evidently thought this was a bad idea, and soon he and Conner were arguing loudly at an intersection about whether to return to the party. Someone in the neighborhood called the police.

First on the scene was officer Jeffrey Lovett. After questioning the men briefly, he began to write out tickets for breach of the peace. According to Miller, Lovett refused to allow Conner to read his ticket, telling him to "just sign it * * * it's 3:00 in the morning", and shouting at Miller, who had already signed his ticket, to "get the * * * out of here." Miller refused to leave and told Conner not to sign the ticket until Lovett allowed him to read it. Officer Robert Nappe arrived during this confrontation, and at some point the officers decided to arrest Conner for refusing to sign his ticket. Lovett testified that when Miller realized his friend was being arrested, he became enraged, kicked the squad car, and ran off through the neighborhood.

A witness who was returning from the party observed what happened next from behind a fence, unnoticed by the participants. He testified that Miller ran to a nearby home and pounded on the front door, calling out to the owner, "Mr. Zampano, help me". The witness then saw two police officers pull Miller away from the door, wrestle him to the ground, and strike him repeatedly on the head and upper body. Miller attempted to block the blows with his arms and pleaded with the officers to "stop hitting me * * * I give up * * * Don't hit me." At trial, officer Nappe testified that there was "a fight, basically", that "[w]e were down, we were rolling on the ground", but that he did not strike Miller. Officer Lovett testified that "I used it [a blackjack on Miller], but don't know where I hit him."

After Miller was arrested, he was taken by ambulance to the Yale–New Haven hospital. The medical records indicate that he suffered multiple bruises and lacerations on his scalp, and experienced pain in his jaw that caused him difficulty in chewing. X-rays of Miller's skull revealed no fractures, however, and he was released from the hospital after receiving treatment.

Miller brought this suit against the officers, alleging that they violated his constitutional rights by using excessive force in making the arrest. He also asserted that, under Connecticut law, the officers were

negligent in carrying out their duties and committed the common-law tort of assault and battery. On a motion accompanying defendants' answer, the district court dismissed Miller's statelaw claims on the grounds that "courts in this district have repeatedly discouraged pendent claims in section 1983 litigation", and that Miller had failed to overcome the factors set forth in *Esposito v. Buonome*, 647 F.Supp. 580 (D.Conn.1986) which support the dismissal of pendent claims.

At the close of the evidence, the district court charged the jury on the question of whether the officers used unconstitutionally excessive force. Relying on *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), the court instructed the jury to consider

> the need, if any, for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether the force was applied in a good faith effort to maintain or restore discipline, or was it maliciously and sadistically used for the very purpose of causing harm.

After discussing the standards for liability under § 1983, the court instructed the jury on the issue of damages. Included in this instruction was the following description of a plaintiff's duty to mitigate damages:

> Even if you find that the plaintiff was injured as a natural consequence of conduct by the defendants in violation of Section 1983, you must determine whether the plaintiff could have done something to avoid or minimize the harm that he suffered. The burden is on the defendants to prove by a preponderance of the evidence that the plaintiff could have avoided or minimized the harm that was done to him and that he failed to do so. If the defendants convince you that the plaintiff could have reduced the harm done to him, but failed to do so, the plaintiff is entitled only to damages sufficient to compensate him for the injury that he would not have suffered if the

defendants had taken appropriate action to avoid or reduce the harm done to him.

The jury returned a verdict in favor of defendants, and judgment was entered accordingly. Miller now appeals.

## DISCUSSION

### A. *The Excessive Force Charge.*

■ In *Johnson v. Glick* this court adopted the view that constitutional protection from excessive force by police and corrections officers is an aspect of substantive due process "quite apart from any 'specific' of the Bill of Rights". 481 F.2d at 1032. Under *Johnson v. Glick*, official force violates due process only if it is so excessive that it "shocks the conscience", a question that is determined by weighing a combination of objective and subjective factors including the "malicious" or "sadistic" state of mind of the officers involved. Although this approach to excessive force cases gained widespread acceptance in the other circuits, the Supreme Court's decision in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) made it clear, at least in the arrest context, that excessive force claims should generally be analyzed not under the due process clause, but under the fourth amendment's "reasonableness" standard. *See Heath v. Henning*, 854 F.2d 6 (2d Cir.1988) (reasonableness standard applies where police use deadly force against fleeing felony suspect); *Davis v. Little*, 851 F.2d 605 (2d Cir.1988) (same).

Four days before this appeal was argued, any remaining vitality of *Johnson v. Glick* as a standard for determining excessive force in cases of an arrest or investigatory stop of a free citizen was put to rest with the Supreme Court's decision in *Graham v. Connor*, —— U.S. ——, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). *Graham* definitively and expressly rejected the *Johnson v. Glick* approach, holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard". 109 S.Ct.

at 1871; *see Calamia v. City of New York,* 879 F.2d 1025, 1033–35 (2d Cir.1989) (discussing *Graham*). Since the reasonableness standard is an objective one, focusing on the circumstances confronting the police at the time of the arrest without regard to their underlying motives or attitude toward the suspect, "subjective concepts like 'malice' and 'sadism' have no proper place in th[e] inquiry." *Graham,* 109 S.Ct. at 1873; *see Calamia,* 879 F.2d at 1034–35.

In light of *Graham,* therefore, it was plain error to charge the jury under the old *Johnson v. Glick* standard for evaluating excessive force claims, and we reverse "without considering whether the appropriate objections were made below." *Heath,* 854 F.2d at 9. The court must instruct the jury to determine whether the officers' use of force was objectively reasonable by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the interests of the police in making the arrest in the particular manner it was made. *Graham,* 109 S.Ct. at 1871. The jury must also keep in mind that

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* (quotations and citations omitted). Thus, the jury should be instructed to give careful attention to the facts and circumstances of the case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

### B. *The Mitigation Charge.*

■ The court also erred in instructing the jury to consider whether Miller "could

have avoided or minimized the harm that he suffered". While it is true that a plaintiff has an obligation to mitigate his damages by obtaining reasonable medical care, *see, e.g., Rapisardi v. United Fruit Co.,* 441 F.2d 1308, 1312 (2d Cir.1971) (refusal to wear eye patch as prescribed by doctor); *Yosuf v. United States,* 642 F.Supp. 432, 441–42 (M.D.Pa.1986) (failure to obtain corrective surgery and physical therapy) (§ 1983 action); *Young v. American Isbrandtsen Lines, Inc.,* 291 F.Supp. 447, 450 (S.D.N.Y.1968) (refusal to undergo surgery); M. Schwartz & J. Kirklin, *Section 1983 Litigation: Claims, Defenses, and Fees* § 14.12 (1986); Restatement (Second) of Torts § 918, there is no evidence in the record before us that Miller failed to obtain prompt treatment for his injuries or that he refused to follow his doctor's advice. Although a medical technician and a paramedic testified that Miller was angry and uncooperative in the ambulance, neither witness said that Miller's actions aggravated his injuries or that different conduct in the ambulance would have reduced Miller's injuries. Miller received appropriate treatment at the hospital, took his medication as prescribed, and returned at the proper time for the removal of his sutures. Under these circumstances, an instruction on Miller's obligation to mitigate his damages was at best gratuitous.

■ Even if there were evidence here that warranted a mitigation instruction, the charge given by the district court would have misled the jury as to the scope of Miller's obligation. A properly phrased mitigation charge should limit the jury's consideration to what the plaintiff did or should have done *after* being injured. *See* E. Devitt, C. Blackmar & M. Wolff, *Federal Jury Practice & Instructions* § 85.13 (1987). It focuses on the plaintiff's duty "to prevent the aggravation" of injuries already received and "to effect a recovery from such injuries." *Id.* There can be no duty to mitigate damages until the injury causing those damages actually occurs.

That Miller could have "avoided" the altercation that resulted in his injuries by peacefully leaving the scene when he was

told to do so may have bearing on the issue of liability—that is, whether the police used unreasonable force under the circumstances—but it has nothing to do with whether he took appropriate steps to minimize his damages after the incident took place. If a plaintiff's duty to mitigate damages were to include the duty to avoid the underlying injury, few arrestees could recover damages under § 1983 since most could have "avoided" engaging in the conduct that precipitated the arrest.

By instructing the jury to consider whether Miller could have avoided the harm that he suffered, the district court created the erroneous impression that Miller could have mitigated his damages by walking away from the altercation. Certainly the defendants' attorney thought this was what the court's instruction meant, for in arguing for the mitigation charge, he stated:

> I think that mitigation includes a plaintiff's ability to mitigate his damages by self help, and in this case, *it's perfectly possible for the jury to have concluded that Mr. Miller could have mitigated his problem and his damages by going home,* which he clearly had the option of doing from the very beginning until almost the end of the episode. (emphasis added).

Since the charge "appears likely to have left the jury 'highly confused' ", to say the least, and was clearly and erroneously prejudicial, it constitutes reversible error. *National Railroad Passenger Corp. v. One 25,900 Square Foot More or Less Parcel of Land,* 766 F.2d 685, 688 (2d Cir.1985) (quoting *DeLima v. Trinidad Corp.,* 302 F.2d 585, 587 (2d Cir.1962)); *Norfleet v. Isthmian Lines, Inc.,* 355 F.2d 359, 362–63 (2d Cir.1966).

### C. *Dismissal of Pendent Claims.*

The standards governing pendent jurisdiction are by now well established. They bear repetition, however, considering their continued misapplication by some district courts. The modern doctrine of pendent jurisdiction derives from *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *Gibbs* estab-

lished that federal courts have jurisdiction to hear claims under state law whenever (1) there is a claim arising under the constitution or federal laws; (2) the relationship between the federal claim and the state claim permits the conclusion that the entire action comprises but one constitutional case; (3) the federal claim has substance sufficient to confer subject matter jurisdiction on the court; and (4) the state and federal claims derive from a common nucleus of operative fact. *Id.* at 725, 86 S.Ct. at 1138. And if, when considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming the substantiality of the federal issues, courts have the power to hear the case as a whole. *Id.*

As the Court has recently reemphasized, *Gibbs* was, in large part, a response to the "hesitancy of federal courts to recognize jurisdiction over state-law claims," and was intended "not only to clarify, but also to broaden, the scope of federal pendent jurisdiction." *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988). Consistent with this policy, " 'considerations of judicial economy, convenience and fairness to litigants' support a wideranging power in the federal courts to decide state-law claims in cases that also present federal questions." *Id.* (quoting *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139). The exercise of pendent jurisdiction is particularly appropriate in actions where the state claims closely parallel issues of federal policy. *See Gibbs,* 383 U.S. at 727, 86 S.Ct. at 1139; *Pride v. Community School Board,* 482 F.2d 257, 272 (2d Cir.1973).

*Gibbs* and *Carnegie–Mellon* clearly contemplate a wide range of situations in which courts should consider state claims on their merits. Yet the doctrine of pendent jurisdiction remains one of sound judicial discretion, *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139; *Fay v. South Colonie Central School District,* 802 F.2d 21, 34 (2d Cir.1986), and a court should normally decline to hear pendent claims if it would

work an injustice between the parties, waste judicial resources, or generate needless decisions of state law. *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139; *Federman v. Empire Fire & Marine Insurance Co.,* 597 F.2d 798, 809 (2d Cir.1979). A court may also decline jurisdiction where state-law issues substantially predominate, or where divergent legal theories of relief would likely confuse the jury. *Gibbs,* 383 U.S. at 726–27, 86 S.Ct. at 1139–40. While a court should not routinely exercise pendent jurisdiction without considering these factors, this does not mean that state claims should be dismissed as a matter of course. *Perez v. Ortiz,* 849 F.2d 793, 798 (2d Cir.1988). Instead, "given advantages of economy and convenience and no unfairness to litigants, *Gibbs* contemplates adjudication of these claims." *Hagans v. Lavine,* 415 U.S. 528, 546, 94 S.Ct. 1372, 1383, 39 L.Ed.2d 577 (1974).

With these basic principles guiding our inquiry, we conclude that the district court abused its discretion in dismissing Miller's state-law claims. As *Gibbs* makes clear, one of the most significant factors a court should consider in exercising pendent jurisdiction is the interrelationship between the state-law claims and questions of federal policy. Where the two are "closely tied * * * the argument for exercise of pendent jurisdiction is particularly strong." 383 U.S. at 727, 86 S.Ct. at 1139. Such an interrelationship between state law and federal policy is particularly evident in police brutality cases, where claims of excessive force, unreasonable searches and seizures, and wrongful arrests "find ready analogues in the common-law torts of assault, battery, false arrest, false imprisonment, or trespass." M. Schwartz & J. Kirklin, *supra* § 14.10 (1976). Moreover, not only did Miller's state and federal claims derive from a "common nucleus of operative fact", but resolution of his federal claim necessarily required the court to draw on common-law principles of tort doctrine. The Supreme Court has repeatedly stated that § 1983 "creates a species of tort liability" in which damages are "ordinarily determined according to principles derived from the common law of torts."

*Memphis Community School District v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 2542, 91 L.Ed.2d 249 (1986); *see also Smith v. Wade,* 461 U.S. 30, 34, 103 S.Ct. 1625, 1628, 75 L.Ed.2d 632 (1983); *Carey v. Piphus,* 435 U.S. 247, 253, 257–58, 98 S.Ct. 1042, 1046, 1048–49, 55 L.Ed.2d 252 (1978); *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976).

So closely tied are state and federal issues in excessive force cases that the Connecticut Supreme Court has held that an award of damages in a § 1983 action collaterally estops the plaintiff from recovering damages in a subsequent state court lawsuit. *Virgo v. Lyons,* 209 Conn. 497, 551 A.2d 1243 (1988). In *Virgo,* the plaintiff attempted to litigate state-law claims for assault and battery and negligence as pendent claims in a § 1983 action alleging that he was the victim of police brutality. The district court dismissed the pendent claims under *Gibbs,* but the jury awarded him compensatory and punitive damages on his federal claim. In holding that this recovery precluded a subsequent state action on the tort claims, the *Virgo* court stated that the issue of damages under Connecticut law had already been decided in the federal suit because "both [the federal and state] causes of action arose out of the same alleged wrongs, allegedly committed by the same defendants, and involved the same injuries", and because "the interests protected in a § 1983 action are similar to those protected in common law tort actions." 551 A.2d at 1245. In short, the court held that the question of damages under state law was fully litigated and decided in the federal action despite the fact that the state claims themselves were dismissed.

Comity is one of the considerations for a federal court to weigh in determining whether to exercise pendent jurisdiction. *See Carnegie–Mellon,* 108 S.Ct. at 618. That factor need not concern us in excessive force cases in Connecticut, for in *Virgo* the Connecticut Supreme Court itself found it "questionable whether the federal court should have dismissed the pendent state law tort claims" and it referred to the

dismissal as "a possible error". *Virgo*, 551 A.2d at 1246 n. 6.

Like the plaintiff in *Virgo*, Miller asserted a constitutional claim of excessive force and common-law claims for negligence and assault and battery. If these federal and state claims are so tightly interwoven that a decision on the former will collaterally estop litigation of latter, we see no principled reason for refusing to exercise pendent jurisdiction over the entire case, and potential injustice in failing to do so.

The reasons given by the district court for dismissing the state claims are unpersuasive. In its one-page endorsement ruling, the court stated that "courts in this district have repeatedly discouraged pendent claims in section 1983 litigation", and that Miller "d[id] not adequately address the concerns raised in *Esposito [v. Buonome*, 647 F.Supp. 580 (D.Conn.1986)]." It is obvious, first, that dismissing Miller's pendent claims on the ground that they are "discouraged" in § 1983 cases is tantamount to giving no reason at all for their dismissal. No decision of the Supreme Court or of this circuit implies that pendent jurisdiction is disfavored in civil rights actions; indeed our viewpoint is to the contrary. *See Perez*, 849 F.2d at 798.

Even if it ever had validity, *Esposito*, on which the district court relied, is now outdated. There, common-law tort claims were dropped from a § 1983 action primarily because the common-law standard for liability (reasonableness) conflicted with what was assumed to be the federal standard (the "shock the conscience" test of *Johnson v. Glick*) and therefore were thought to create a likelihood of jury confusion. 647 F.Supp. at 581. As we discuss more extensively above, however, the "shock the conscience" standard no longer applies to cases such as this, and the proper test is now one of "reasonableness" under the fourth amendment. *Graham*, 109 S.Ct. 1865. Any remaining danger of jury confusion under the new standard can in most cases readily be met with judicious use of special verdicts and carefully drawn instructions. *See Carroll v. General Da-*

*tacomm Industries, Inc.*, 680 F.Supp. 71, 73 (D.Conn.1987) (Burns, J.).

### CONCLUSION

The judgment of the district court is reversed, and the case is remanded to the district court with a direction to reinstate Miller's state-law claims and to conduct such further proceedings consistent with this opinion as may be appropriate.